## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## WESTERN DIVISION

STEPHEN DONALDSON, CARMELLA CAUSEY, LISA ANN BELL,
HERBERT BELL JR., ROBERT MITCHELL, JR., CALLIE WOODARD,
MARVIN BLAND, DERONDA BRENGETTSY, JACQUELINE GORDON,
DAVID HUNT,  KAHLIYA COLLINS, DWAYNE COLLINS JR., LOLA
COLLINS, INDIVIDUALLY AND ON BEHALF OF ALISHA COLLINS,
FLETCHER MCNABB, KEONNA MCNABB, LAVERNE WILLIAMS,
DOROTHY NORMAN, REGINALD PEARLEY, JR., CHARLES
PELLETIER, ALVIN MOORE, LORINA REESE INDIVIDUALLY AND
ON BEHALF OF KINGSTON BLACKMAN, SAMTRICIA REESE AND
SAMMIONNA REESE, ROBERT LANDERS, MIASHIRLEEN ROBINSON,
DORIS CHAPMAN, LOIS RUSS, LIMMIE SIBLEY III, THOMAS STEWART
INDIVIDUALLY AND ON BEHALF OF TRISTEN JACKSON, TAYLOR
JACKSON, TYSON JACKSON, AND KACYN STEWART, EMMA SANDERS,
LAKIL WEATHERSBY, KIMBERLY WEATHERSBY, AUBREY WALKER,
JOHNNY DEARING,  MILLISSIA DEARING, WILLIE JOHN CAUSEY,
KEVIN DIXON, LADONNA GRIFFIN, WORAN GRIFFIN, DAJUAN GRIFFIN,
RAYMOND HANSON, MARCUS HILL, ANNIE HILL, DAMION HORTON,
JOY HORTON, PAULA HORTON, CASSANDRA GREEN, LISA JACOBS,
DEBRA BUTLER, THERESA GLOVER, INDIVIDUALLY AND ON BEHALF OF
JAMERICA BAKER, MARGIE HANSON, LOZELL ANDERSON, JAYWANDA
COTTEN, EDDIE JAMES, WHITNEY THOMAS INDIVIDUALLY AND ON
BEHALF OF LAILEAUNA HAMPTON AND ASYA ALLEN,
CHIQUILLA DUNN, JAMES DUNN, AND JOE MARS          PLAINTIFFS

VS.                                      CIVIL ACTION NO. 5:25-cv-110-KS-BWR

DRAX BIOMASS INC.;
ELIMINI US DEVELOPMENT, LLC;
ELIMINI, INC.;
ELIMINI US HOLDINGS, LLC;
AMITE BIOENERGY, LLC; AND
DRAX BIOMASS INTERNATIONAL HOLDINGS LLC          DEFENDANTS

### COMPLAINT

Plaintiffs Stephen Donaldson, Carmella Causey, Lisa Ann Bell, Herbert Bell Jr., Robert Mitchell,
Jr., Callie Woodard, Marvin Bland, Deronda Brengettsy, Jacqueline Gordon, David Hunt,  Kahliya
Collins, Dwayne Collins Jr.,  Lola Collins, individually and on behalf of Alisha Collins, Fletcher
McNabb, KeOnna McNabb, Laverne Williams, Dorothy Norman, Reginald Pearley, Jr., Charles
Pelletier, Alvin Moore, Lorina Reese individually and on behalf of Kingston Blackman, Samtricia
Reese and Sammionna Reese, Robert Landers, Miashirleen Robinson, Doris Chapman, Lois Russ,

Limmie Sibley III, Thomas Stewart individually and on behalf of Tristen Jackson, Taylor Jackson, Tyson Jackson, and Kacyn Stewart, Emma Sanders, Lakil Weathersby, Kimberly Weathersby, Aubrey Walker, Johnny Dearing, Millissia Dearing, Willie John Causey, Kevin Dixon, Ladonna Griffin, Woran Griffin, Dajuan Griffin, Raymond Hanson, Marcus Hill, Annie Hill, Damion Horton, Joy Horton, Paula Horton, Cassandra Green, Lisa Jacobs, Debra Butler, Theresa Glover, individually and on behalf of Jamerica Baker, Margie Hanson, Lozell Anderson, Jaywanda Cotten, Eddie James, Whitney Thomas individually and on behalf of Laileauna Hampton and Asya Allen, Chiquilla Dunn, James Dunn, and Joe Mars file this action against Defendants Drax Biomass Inc.; Elimini US Development, LLC; Elimini, Inc.; Elimini US Holdings, LLC; Amite BioEnergy, LLC; and Drax Biomass International Holdings LLC, and allege as follows:

# COMPLAINT INDEX

**I. INTRODUCTION**, 2

**II. PARTIES**, 3
   II.A. Plaintiffs, 3
   II.B. Defendants, 4
      II.B.i. Drax Biomass Inc. f/k/a Drax Biomass International Inc., 4
      II.B.ii. Elimini US Development, LLC, f/k/a Drax US BECCS Development, LLC, 5
      II.B.iii. Elimini, Inc., f/k/a Drax North America BECCS, INC., 6
      II.B.iv. Elimini US Holdings, LLC, f/k/a Drax US BECCS Holdings, LLC, 7
      II.B.v. Amite BioEnergy LLC, 7
      II.B.vi. Drax Biomass International Holdings LLC, 8
   II.C. Relevant Non-Party, Drax Group PLC and its Biomass Operations, 9

**III. JURISDICTION AND VENUE**, 12

**IV. GENERAL ALLEGATIONS**, 13
   IV.A. Amite Facility, 13
   IV.B. Applicable Regulatory Framework, 15
      IV.B.i. Statutory and Regulatory Background, 15
      IV.B.ii. Defendants' Air Pollution Control Permit-to-Construct for Amite Facility, 20
      IV.B.iii. Defendants Underestimated Amite Facility's Potential to Emit VOCs and Actual VOC Emissions, 21
      IV.B.iv. Defendants Exceeded the VOC Emission Limits of the Air Construction Permit, 25
      IV.B.v. Defendants Underestimated HAPs Released From their Facility, Evaded Identification as a HAP major source, and Exceeded HAP Limits of their Air Construction Permit, 29
      IV.B.vi. Defendants' Actions Violate Mississippi Law and the CAA, 33
      IV.B.vii. Air Quality Violations at Defendants' Other Facilities, 34
   IV.C. Defendants' Operations Exposed the Gloster Community and the Plaintiffs to Dangerous Pollutants with Established Adverse Impacts on Human Health, 37
      IV.C.i. Volatile Organic Compounds (VOCs), 38
      IV.C.ii. Hazardous Air Pollutants (HAPs), 38
      IV.C.iii. Acetaldehyde, 39
      IV.C.iv. Formaldehyde, 39
      IV.C.v. Methanol, 40
      IV.C.vi. Acrolein, 40
      IV.C.vii. Phenol, 41
      IV.C.viii. Benzene, 41
      IV.C.ix. Nitrogen Oxides, 42
      IV.C.x. PM, 43
      IV.C.xi. Wood Dust, 44
      IV.C.xii. Noise Pollution, 45

IV.D. Damages to Plaintiffs Caused by Defendants' Acts and Omissions, 45

**V. <u>SERVICE OF NOTICE OF INTENT TO SUE PURSUANT TO THE CAA</u>**, 47

**VI. <u>CLAIMS FOR RELIEF</u>**, 48
  VI. COUNT I: VIOLATIONS OF PERMIT LIMITS ON FACILITY-WIDE HAP
  EMISSIONS, 48
  VI. COUNT II: VIOLATIONS OF PERMIT LIMITS ON FACILITY-WIDE VOC
  EMISSIONS, 49
  VI. COUNT III: NEGLIGENCE, 49
  VI. COUNT IV: NEGLIGENCE *PER SE*, 51
  VI. COUNT V: TRESPASS TO REAL PROPERTY, 52
  VI. COUNT VI: PRIVATE NUISANCE, 53
  VI. COUNT VII: NUISANCE *PER SE*, 54
  VI. COUNT VIII: UNJUST ENRICHMENT, 56
  VI. COUNT IX: FRAUD, 56
  VI. COUNT X: CIVIL CONSPIRACY, 59

**VII. <u>JURY DEMAND</u>**, 60

**VIII. <u>PRAYER FOR RELIEF</u>**, 60

## INTRODUCTION

1. This lawsuit arises out of continuing and past releases of toxic air pollutants from Defendants' wood pellet manufacturing facility located at 1763 South Georgia Pacific Road, Suite 2, Gloster, Amite County, Mississippi, 39368 ("Amite Facility" or "Facility"). Plaintiffs bring this action under 42 U.S.C. § 7604, the citizen suit provision of the Clean Air Act, as amended, 42 U.S.C. § 7401, *et seq.* ("CAA"), seeking injunctive relief and civil penalties. Additionally, Plaintiffs bring common law claims and seek compensatory and punitive damages for the harms that they have suffered arising out of Defendants' wrongful actions.

2. As a byproduct of wood pellet production, the Amite Facility emits large amounts of volatile organic compounds ("VOCs"), hazardous air pollutants ("HAPs"), nitrogen oxides (NOx), sulfur dioxide ($SO_2$), carbon monoxide (CO), wood dust and other particulate matter (sometimes referred to herein as "PM") (collectively "air pollutants" or "air emissions"). These air emissions, which carry significant risks to human health and safety, are subject to regulation under the Facility's Air Pollution Control Permit-to-Construct Air Emissions Equipment Permit No. 0080-00031 ("Air Construction Permit") issued by the Mississippi Department of Environmental Quality ("MDEQ") in 2012.

3. Defendants' Amite Facility has been emitting excess quantities of toxic VOCs and HAPs that have dramatically exceeded the permissible limits of its Air Construction Permit. The Facility has therefore been out of compliance with Mississippi's federally enforceable State Implementation Plan ("SIP") and the CAA, for over a decade.

4. The air pollutants emitted from the Amite Facility are transported through the ambient air and deposited onto and into nearby homes, including those occupied by the Plaintiffs. Wood dust and other particulate matter visibly remain on building structures, personal property, yards and grounds located on Plaintiffs' properties. Also present, but unseen, are other hazardous chemicals

knowingly released by the Defendants. Plaintiffs, who breathe in these air pollutants daily, continue to suffer substantial physical discomfort. Plaintiffs' knowledge that they and their family members are continuously breathing in toxic substances with known implications on human health has caused Plaintiffs to experience annoyance. Moreover, Plaintiffs' real and personal properties have been directly impacted by the continuous pollution emanating from the Defendants' Facility.

5. The State of Mississippi and the British government have paid Defendants billions in subsidies, tax breaks, and other benefits to run their business under the false pretense of "clean energy." Instead, the Defendants have owned and operated a wood-pellet manufacturing facility for 10 years that has consistently failed to meet their legal obligations not to dump pollutants on Plaintiffs and have continued to denude U.S. forests, all for the benefit of a British company. The toxic pollutants Defendants have knowingly dumped on Plaintiffs in violation of their Air Construction Permit and the law have damaged Plaintiffs' health and properties. Defendants are thus subject to ongoing civil penalties and injunctive relief. They should be ordered to stop their pollution, pay fines, and compensate the Plaintiffs for the harm that they have endured.

## II.    PARTIES

### A. Plaintiffs

6. At all relevant times hereto, Plaintiffs are individuals who were/are homeowners, renters, residents, and/or occupants, and had property in Gloster, MS.

7. Plaintiffs have all suffered damages, losses, and harm as a result of the Defendants' tortious and reckless actions. These damages include but are not limited to the cost of remediating and mitigating the impacts of the Amite Facility's emissions on their properties, the loss of use of their properties in addition to the comfortable enjoyment of their properties, the loss in value and marketability of their properties, damages based on annoyance, interference, inconvenience and discomfort, and other economic damages. Additionally, individual Plaintiffs' constant exposure

to the dangerous air pollutants released from the Facility has caused Plaintiffs to experience physical discomfort. Plaintiffs seek damages to compensate them for these injuries.

8. Plaintiffs have elected to join their individual lawsuits into a single action under the permissive joinder rule Miss. R. Civ. P. 20. Plaintiffs do not seek class certification or relief on any collective basis. Instead, they seek damages and other remedies on an individual basis.

**B. Defendants**

    **i.**   **Drax Biomass Inc. f/k/a Drax Biomass International Inc.**

9. Defendant Drax Biomass Inc. is and was at all times relevant to the actions described in this Complaint a Delaware corporation with its principal office address listed as 1500 N. 19th Street, Suite 501, Monroe, LA 71201. Drax Biomass Inc. is authorized to do business and does business as a foreign corporation in the State of Mississippi under Business ID 1021600. Its registered agent is Corporation Service Company, located at 109 Executive Drive, Suite 3, Madison, MS 39110.[1]

10. Drax Biomass Inc. is a "person" within the meaning of Section 302(e) of the CAA. 42 U.S.C. § 7602(e).

11. Drax Biomass Inc. is a subsidiary of Drax Group PLC, a United Kingdom (UK) based power company and wood pellet manufacturer. Drax Biomass Inc.'s principal activity is biomass pellet manufacturing in the United States. Drax Biomass Inc. owns Defendant Amite BioEnergy, LLC.

12. The State of Mississippi has given Defendants many financial incentives. For instance, according to the Mississippi Development Authority, the State of Mississippi awarded Drax Biomass Inc. $2.8 million in grants, in addition to several tax exemptions which include: full 10-

---

[1] Drax Biomass Inc. was previously operated under the name "Drax Biomass International Inc." The name change became effective on April 16, 2015.

year corporate income and corporate franchise tax exemptions as well as a 10-year sales and use tax exemption estimated at about $1.5 million, to open the Amite Facility. The company also received a 10-year local property tax exemption.

13. In addition to the Amite Facility, Drax Biomass Inc. owns and operates six other wood pellet mills in the U.S., including the Drax Morehouse, Louisiana, Facility ("Morehouse Facility"), which Drax's refers to as Amite's "sister facility."

14. At all relevant times Defendant Drax Biomass Inc. or its subsidiaries, agents, and entities over which it exercised operational control unlawfully released or caused to be released excess amounts of dangerous and toxic air pollutants from the Amite Facility, which caused injuries to each of the named Plaintiffs.

### ii. Elimini US Development, LLC f/k/a Drax US BECCS Development, LLC[2]

15. Defendant Elimini US Development, LLC, is and was at all times relevant to this Complaint a Delaware limited liability company, with its principal office address listed as 1500 N. 19th Street, Suite 501, Monroe, LA 71201. Elimini US Development, LLC, is authorized to do business and does business in Mississippi as a foreign limited liability company under Business ID 1414102. Its registered agent is Corporation Service Company, located at 109 Executive Drive, Suite 3, Madison, MS 39110.

16. Elimini US Development, LLC, is a "person" within the meaning of Section 302(e) of the CAA. 42 U.S.C. § 7602(e).

17. Elimini US Development, LLC, is a subsidiary of Drax Group PLC, with a principal activity as a holding company.

---

[2] Elimini US Development, LLC, previously operated under the name "Drax US BECCS Development, LLC." The name change became effective on November 21, 2024.

18. At all relevant times Defendant Elimini US Development, LLC, and its subsidiaries, agents, and entities over which it exercised operational control unlawfully released or caused to be released excess amounts of dangerous and toxic air pollutants from the Amite Facility, which caused injuries to each of the named Plaintiffs.

### iii. Elimini, Inc. f/k/a Drax North America BECCS, INC.[3]

19. Defendant Elimini, Inc., is and was at all times relevant to this Complaint a Delaware corporation, with its principal office address listed as 1500 N. 19th Street, Suite 501, Monroe, LA 71201. Elimini, Inc., is authorized to do business and does business in Mississippi as a foreign corporation under Business ID 1413915. Its registered agent is Corporation Service Company, located at 109 Executive Drive, Suite 3, Madison, MS 39110.

20. Elimini, Inc., is a "person" within the meaning of Section 302(e) of the CAA. 42 U.S.C. § 7602(e).

21. Elimini, Inc., is a subsidiary of Drax Group PLC, with a principal activity identified as provision of corporate services.

22. At all relevant times Defendant Elimini, Inc., and its subsidiaries, agents, and entities over which it exercised operational control unlawfully released or caused to be released excess amounts of dangerous and toxic air pollutants from the Amite Facility, which caused injuries to each of the named Plaintiffs.

### iv. Elimini US Holdings, LLC f/k/a Drax US BECCS Holdings, LLC[4]

23. Defendant Elimini US Holdings, LLC, is and was at all times relevant to this Complaint a Delaware limited liability company, with its principal office address listed as 1500 N. 19th Street,

---

[3] Elimini, Inc., previously operated under the name "Drax North America BECCS, Inc." The name change became effective on November 22, 2024.
[4] Elimini US Holdings, LLC, was previously operated under the name "Drax US BECCS Holdings, LLC." The name change became effective on November 21, 2024.

Suite 501, Monroe, LA 71201. Elimini US Holdings, LLC, is authorized to do business and does business in Mississippi as a foreign limited liability company under Business ID 1413922. Its registered agent is Corporation Service Company, located at 109 Executive Drive, Suite 3, Madison, MS 39110.

24. Elimini US Holdings, LLC, is a "person" within the meaning of Section 302(e) of the CAA. 42 U.S.C. § 7602(e).

25. Elimini US Holdings, LLC, is a subsidiary of Drax Group PLC, with principal activity as a holding company.

26. At all relevant times Defendant Elimini US Holdings, LLC, and its subsidiaries, agents, and entities over which it exercised operational control unlawfully released or caused to be released excess amounts of dangerous and toxic air pollutants from the Amite Facility, which caused injuries to each of the named Plaintiffs.

### v. **Amite BioEnergy LLC**

27. Defendant Amite BioEnergy LLC is and was at all times relevant to this Complaint a Delaware limited liability company, with its principal office address listed as 1500 N. 19th Street, Suite 501, Monroe, LA 71201. Amite BioEnergy LLC is authorized to do business and does business as a foreign limited liability company in the State of Mississippi under Business ID 1004968. Its registered agent is Corporation Service Company, located at 109 Executive Drive, Suite 3, Madison, MS 39110.

28. Amite BioEnergy LLC owns and operates the Amite Facility, a wood-pellet manufacturing facility located at 1763 South Georgia Pacific Road, Suite 2, Gloster, MS 39638.

29. Amite BioEnergy LLC is a "person" within the meaning of Section 302(e) of the CAA. 42 U.S.C. § 7602(e).

30. Amite Bioenergy LLC is a subsidiary of Drax Group PLC, with fuel supply identified as its principal activity.

31. At all relevant times Defendant Amite BioEnergy LLC and its subsidiaries, agents, and entities over which it exercised operational control unlawfully released or caused to be released excess amounts of dangerous and toxic air pollutants from the Amite Facility, which caused injuries to each of the named Plaintiffs.

### vi. Drax Biomass International Holdings LLC

32. Drax Biomass International Holdings LLC is and was at all times relevant to this Complaint a Delaware limited liability company doing business in the State of Delaware under File Number 5250168. Its registered agent is Corporation Service Company, located at 251 Little Falls Drive, Wilmington, DE 19808.

33. Drax Biomass International Holdings LLC is a "person" within the meaning of Section 302(e) of the CAA. 42 U.S.C. § 7602(e).

34. Drax Biomass International Holdings LLC is a subsidiary of Drax Group PLC, with its principal activity as a holding company.

35. At all relevant times Defendant Drax Biomass International Holdings LLC and its subsidiaries, agents, and entities over which it exercised operational control unlawfully released or caused to be released excess amounts of dangerous and toxic air pollutants from the Amite Facility, which caused injuries to each of the named Plaintiffs.

36. Hereinafter, Drax Biomass Inc.; Elimini US Development, LLC; Elimini, Inc.; Elimini US Holdings, LLC; Amite BioEnergy LLC; and Drax Biomass International Holdings LLC shall collectively be known as "Defendants" or "Drax Defendants" unless referenced individually.

### C. Relevant Non-Parties: Drax Group PLC and its Biomass Operations

37. Drax Group PLC (hereinafter "Drax Group") is an energy company that does business in the United States, with its corporate headquarters in North Yorkshire, United Kingdom. It was founded in 2005, and it is traded on the London Stock Exchange (LSE") as DRX.

38. In addition to operating the largest power station in the UK, Drax Group also operates a global bioenergy supply business with manufacturing facilities at 13 sites in the United States and Canada, producing compressed wood pellets for its own use and for customers in Europe and Asia.

39. Drax Group is the parent company of 15 subsidiaries operating in the United States, including Defendants Drax Biomass Inc.; Elimini US Development, LLC; Elimini, Inc.; Elimini US Holdings, LLC; Amite Bioenergy LLC; and Drax Biomass International Holdings LLC.

40. As of 2022, Drax Group claimed to have almost 20 years' experience in biomass operations, stating that "Drax is a major producer, supplier and user of sustainable biomass, active in all areas of the supply chain with long-term relationships and almost 20 years' experience in biomass operations."[5]

41. At all relevant times Drax Group through its subsidiaries, agents, and entities over which it exercised operational control unlawfully released or caused to be released excess amounts of toxic air pollutants from the Amite Facility, which caused injuries to each of the named Plaintiffs.

42. Biomass refers to organic material from plants and animals which contain stored chemical energy that can be used as a source of energy. Wood pellets, which are manufactured at the Amite Facility, are a solid biofuel type of biomass.

43. The wood pellet manufacturing industry exploded in the U.S. South beginning in the late 2000s, when the European Union ("EU") began subsidizing burning wood for electricity under the false presumption that doing so would be carbon neutral.

---

[5] Innovating for a Positive Future: Drax Group PLC annual report and accounts (2021).

44. A 2018 study found that wood pellet production facilities in the southeastern U.S. are 50 percent more likely to be located in environmental justice designated communities (an area identified by the United States Environmental Protection Agency ("EPA") as having higher environmental and health risks that disproportionately affect minority and impoverished neighborhoods.)[6]

45. Wood pellets are designated as "renewable energy" in the EU and the UK, which results in billions of British pounds in government subsidies. Drax Group is one of the greatest beneficiaries of these subsidies, receiving £789.2 million (over $1 billion) in subsidies in 2018 and £617 million (over $7.93 million) in subsidies in 2022. It is projected that by 2027, Drax Group will have received an estimated £11 billion (over $14.1 billion) from the UK taxpayers.[7]

46. Notwithstanding claims that wood pellets produce zero carbon emissions, a host of scientific studies offer convincing evidence that burning forest biomass is not a viable climate solution, and that it produces rather than reduces heat-trapping greenhouse gas ("GHG") emissions. In fact, studies show that wood pellets emit more carbon dioxide ("$CO_2$") per unit of energy than burning coal. Recent studies have shown that $CO_2$ emissions from combusting woody biomass for heat are 30 percent higher than those of coal and 2.5 times that of gas.

47. Approximately 80 percent of the wood pellets burned by Drax Group in the UK come from North America.

---

[6] Stefan Koester and Sam Davis, *Siting of Wood Pellet Production Facilities in Environmental Justice Communities in the Southeastern United States*, Environmental Justice, Vol. 11, No. 2 (April 1, 2018), https://doi.org/10.1089/env.2017.0025.

[7] House of Commons, Business, Energy and Industrial Strategy Committee, Decarbonisation of the power sector: Eleventh Report of Session 2022–23, at 55 (2023), https://committees.parliament.uk/publications/40819/documents/199063/default/.

48. In 2018, Drax Group imported over 4.4 million tons of wood pellets from the southeastern U.S. This equates to over 32,500 hectares (325 square kilometers) or 80,300 acres (125 square miles) of U.S. forests that were harvested in 2018 alone to supply wood pellets for Drax .

49. In 2019, according to Chatham House and Woodwell Climate Center, U.S.-sourced wood pellets burned for energy in the UK were responsible for between 13 million and 16 million tons of $CO_2$ emissions, when taking into account emissions from their combustion and their supply chain, forgone removals of $CO_2$ from the atmosphere due to the harvest of live trees and emissions from the decay of roots and unused logging residues left in the forest after harvest.[8]

50. The Amite Facility operations alone have reported releasing 60,647 tons of non-biogenic GHGs from 2018 through 2024.[9] These estimates exclude GHG emissions generated from the use of biofuel, or the emissions generated by the wood-fired furnace. In the two years when these emissions were reported (2019 and 2020), the Amite Facility released 291,051.30 tons of GHG from burning bark and wood.[10]

51. In October of 2021, Drax Group was taken off the S&P Global Clean Energy Index.

52. In 2023, Great Britain's independent energy regulator Ofgem launched a formal investigation into Drax Group's sustainability credentials after discovering that approximately 80 percent of wood pellets burned by Drax Group in the UK come from North America, with old, slow-growing trees that act as important natural carbon sinks that were potentially felled to burn for energy.

53. In 2023, Drax Group posted $1.5 billion in profits.

---

[8] *Id.*

[9] Semi-Annual Reporting for Amite BioEnergy, LLC, Wood Pellet Manufacturing Facility (dated January 29, 2019, January 31, 2020, January 29, 2021, January 28, 2022, January 20, 2023, January 22, 2024, and January 30, 2025).

[10] Semi-Annual Reporting for Amite BioEnergy, LLC, Wood Pellet Manufacturing Facility (dated January 31, 2020 and January 29, 2021).

### III.    JURISDICTION AND VENUE

54. Plaintiffs' action against the Drax Defendants arises under the CAA for past and ongoing violations of their Air Construction Permit, the Mississippi SIP, and the CAA.  Plaintiffs' action is related to Defendants' operation of a wood pellet manufacturing facility in Gloster, MS, which is regulated by MDEQ.

55. Plaintiffs have authority to bring the specific claims alleged below under 42 U.S.C. § 7604. Specifically, 42 U.S.C. § 7604(a)(1) authorizes civil action against "any person . . . who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of . . . an emission standard or limitation under this chapter."

56. The CAA's citizen suit provision defines "emission standard or limitation under this chapter" as to include an "emission limitation, standard of performance or emission standard." 42 U.S.C. § 7604(f)(1).  The CAA additionally defines "emission standard or limitation under this chapter" to include "any other standard, limitation, or schedule established under any permit issued pursuant to subchapter V [Title V] or under any applicable State implementation plan approved by the Administrator, any permit term or condition." 42 U.S.C. § 7604(f)(4).

57. The specific claims alleged below arise from repeated and ongoing violations of emission limits and standards set forth in the Air Pollution Permit issued pursuant to Mississippi's' federally approved SIP, and these violations are therefore enforceable under 42 U.S.C. § 7604(f)(1) and (f)(4).

58. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 42 U.S.C. § 7604(a) (CAA jurisdiction).  An actual, justiciable controversy exists between Plaintiffs and Defendants. Supplemental jurisdiction over state law claims exists pursuant to 28 U.S.C. § 1367.

59. The citizen suit provision of the CAA grants jurisdiction to United States District Courts to issue an injunction remedying violations of the CAA, to impose appropriate civil penalties for violations of the CAA, and to award costs of litigation (including reasonable attorney and expert witness fees).

60. Venue is properly vested in United States District Court for the Southern District of Mississippi, Western Division, pursuant to Section 304(c)(1) of the CAA, 42 U.S.C. § 7604(c)(1), as the Amite Facility is located in this District.

## IV. GENERAL ALLEGATIONS

### A. Amite Facility

61. The Amite Facility is located in Gloster, Amite County, Mississippi, in the immediate vicinity of residential homes.

62. Gloster has approximately 900 residents, with most residents experiencing significant financial hardship.

63. The Amite Facility was the only regulated facility in the Gloster area emitting significant quantities of VOCs, HAPs, PM, $NO_X$, CO and $SO_2$ until approximately October of 2024.

64. The Amite Facility began production in August 2015, with approximately 65 employees working four-hour shifts during 24-hour operations. The Facility's annual production capacity is permitted at 771,392 oven-dried tons ("ODT") of wood pellets per year.

65. The Facility contains several process areas, including wood receiving and storage, wood debarking, chipping and storage, biomass fuel sizing and storage, chip drying, hammermills, pellet mills, pellet storage and load out.

66. The manufacturing process consists of processing whole wood logs (which make up 80 percent of the raw material), forest residuals (also referred to as "wood chips"), and clean mill (also referred to as "saw dust") into wood pellets.

67. The Amite Facility processes Southern Yellow Pine, which has a high resin content and can emit more VOCs compared to some other wood types.

68. Whole logs are debarked and fed through a woodchipper, which turns them into wood chips. The wood chips are then fed through a wood chip rotary dryer, which reduces the moisture content of the green wood chips to approximately 10 percent. The chips are then ground to a fine powder by dry hammermills and further reduced in size by secondary hammermills. The starch silo and starch addition system add starch as binder, and the ground wood is conveyed from the hammermills to the six pellet mill lines. Each line is equipped with two mills and a cooler. The mills shape the wood mixture into pellets and the cut pellets are cooled in pellet mill coolers. Finished pellets are conveyed into silos for storage until being transferred offsite via truck.

69. Each major step in the wood pellet manufacturing process is a significant source of air pollution.

70. Air pollution and fugitive dust emissions originate from the following sources at the Amite Facility: wood product delivery trucks, wood chip dryer with wood-fired furnace, primary and secondary hammermills, pellet mill coolers, pellet storage silos, dry fiber silos, starch silos, screened material return system, furnace bypass stack, wood chip rotary dryer bypass stack, dry shavings truck dump/baghouse, pellet loadout system, fire pump engine, and emergency generator.

71. From the time that the Facility started operations in 2015 until 2021, the only pollution control devices at the Facility to reduce VOC and HAP emissions were the Regenerative Thermal Oxidizer ("RTO") (intended to provide control of HAP and VOC emissions), and the Wet Electrostatic Precipitator ("WESP") (intended to provide control of PM, acid gas, and HAP emissions). However, these devices only controlled emissions from the chip dryer/furnace. Defendants did not control the significant amounts of VOC and HAP emissions from the hammermills, pellet coolers and other post-dryer processes (collectively "post-dryer units"

because they follow the wood chip dryer in the manufacturing process), instead, releasing these dangerous pollutants into the Gloster community.

**B.  Applicable Regulatory Framework**

    **i.  Statutory and Regulatory Background**

72. The CAA, 42 U.S.C. § 7401, *et seq.,* is a federal law that regulates certain air emissions from certain stationary and mobile sources of air emissions.

73. A central purpose of the CAA is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1).

74. To achieve this, the CAA directs the EPA to establish National Ambient Air Quality Standards ("NAAQS") for "air pollutants" which can harm public health and welfare.[11]

75. In this case, "air pollutant" refers to "any air pollution agent or combination of such agents, including any physical, chemical, biological, radioactive (including source material, special nuclear material, and byproduct material) substance or matter which is emitted into or otherwise enters the ambient air. Such term includes any precursors to the formation of any air pollutant, to the extent the Administrator has identified such precursor or precursors for the particular purpose for which the term "air pollutant" is used."[12]

76. The NAAQS are numerical thresholds for the concentration of each pollutant in the ambient air. The CAA requires EPA to set NAAQS for six principal pollutants, called "criteria pollutants," that are common in outdoor air, considered harmful to public health and the environment, and that come from numerous and diverse sources. NAAQS criteria air pollutants

---

[11] *See,* 42 U.S.C. § 7409.
[12] *See,* 42 U.S.C. §§7602(g).

include ozone ($O_3$), PM, CO, lead, $SO_2$, and nitrogen dioxide ("$NO_2$"). The EPA has determined that maintaining the concentration of these pollutants below the NAAQS thresholds is necessary to protect public health and welfare.

77. The states bear primary responsibility under the CAA for regulating sources of air pollution and attaining ambient air quality standards.[13]

78. State implemented SIPs must satisfy the requirements of the CAA before they are approved by EPA.[14]

79. In general, SIPs consist of state laws, regulations, and permitting mechanisms to implement, maintain and enforce compliance with the NAAQS. Once approved by the EPA, SIPs become federal law and are enforceable by the state, EPA, and citizens under the CAA.[15]

80. Section 304(a) of the CAA, 42 U.S.C. §7604(a), authorizes citizens to bring suit for violation of any "emission standard or limitation" which is in effect under the CAA.

81. Section 304(f) of the Act, 42 U.S.C. §7604(f), defines "emission standard or limitation" to include any standard or limitation which is applicable under an approved SIP, any standard or limitation established under Title V of the CAA, and any requirement under section 112 relating to HAPs.

82. MDEQ is the state air quality authority charged with permitting and enforcing CAA requirements in Mississippi. MDEQ issues permits to new and modified sources of air pollution pursuant to Mississippi's EPA-approved State Implementation Plan ("Mississippi SIP"), enumerated in Title 11, Mississippi Administrative Code, Part 1, Chapter 5 and Part 2, Chapters

---

[13] *See*, 42 U.S.C. §§ 7401; 42 U.S.C. §§ 7410.

[14] *See*, 42 U.S.C. § 7410(a); 42 U.S.C. § 7410(k).

[15] *See*, 42 U.S.C. § 7410; 42 U.S.C. § 7604(f)(4).

1-3, 5 and 11. Moreover, Mississippi law directly adopts the emission standards as set out in the CAA in Miss. Code Ann. § 49-17-34 (1993).

83. The CAA and the Mississippi SIP distinguish between major and minor sources of air emissions, based on a facility's Potential-to-Emit ("PTE") air pollutants subject to regulation under the CAA, utilizing numerical threshold criteria. The PTE determines which facilities are subject to stricter regulatory requirements to control emissions and protect air quality.

84. Major sources are regulated under Title V of the CAA. Title V major sources are defined as any stationary facility or source of air pollutants which directly emits, or has the potential to emit, 100 tons per year ("tpy") or more of any air pollutant.[16]

85. Under the CAA HAPs emissions, a stationary source is classified as major if it has the PTE at or above 10 tpy of any single HAP, or 25 tpy of any combination of HAPs.[17]

86. Certain major sources, including the Amite Facility, are also subject to the CAA Prevention of Significant Deterioration ("PSD") provisions, which seek to prevent significant deterioration of air quality in areas that are in attainment with the NAAQS.

87. The PSD provisions are intended to protect public health and air quality, while ensuring that any increases in air emissions associated with responsible economic growth are not undertaken without careful consideration of the consequences of the action and informed public participation in the authorization process.[18]

---

[16] *See*, 42 U.S.C. §7661(2) and 42 U.S.C. §7602(j).
[17] *See*, 11 Miss. Admin. Code Pt. 2, Ch. 2, R. 2.1; 11 Miss. Admin. Code Pt. 2, Ch. 6, R. 6.1 and 42 U.S.C. §7412(1).
[18] *See*, 42 U.S.C. §7470.

88. In general, a PSD major source subject to these provisions is any stationary source which emits or has the PTE 250 tpy or more of any regulated New Source Review ("NSR") pollutant also known as "criteria pollutants."[19]

89. NSR pollutants include PM, $O_3$, $SO_2$, $NO_2$, CO, and lead.

90. The Amite Facility is not one of the 28 categorical facilities listed in 40 CFR 52.21(b)(1)(i)(a); therefore, the applicable PSD threshold for a major source is 250 tpy.

91. Mississippi recognizes additional categories of emission sources: a "synthetic minor source" which refers to a facility that, while it could potentially emit pollutants at levels that would classify it as a Title V major source, voluntarily accepts emission limits or operating restrictions to avoid being classified as Title V major,[20] and "moderate stationary source" which refers to any new stationary source which requests federally enforceable emissions limits or operating restrictions to avoid PSD major source requirements.[21]

92. A facility classified as a Title V or PSD major source of emissions is subject to significantly more stringent permitting, monitoring, recordkeeping, reporting, and operational requirements than minor sources or synthetic minor sources. Major sources are required to obtain a PSD Permit to Construct and a Title V Operating Permit ("TVOP"), depending on the facility's PTE, which mandate stringent emissions limits and operational requirements.[22]

93. Prior to commencing construction and operation, new PSD major sources are subject to permitting processes that assess the potential air quality impacts of new facilities to ensure they do not violate air quality standards.[23]

---

[19] *See*, 42 U.S.C. §7479.
[20] *See*, 11 Miss. Admin. Code Pt. 2, Ch. 2, R. 2.1.
[21] *See*, 11 Miss. Admin. Code Pt. 2, Ch. 2, R. 2.5.E.
[22] *See*, 11 Miss. Admin. Code Pt. 2, Ch. 2, R. 2.1; 11 Miss. Admin. Code Pt. 2, Ch. 6, R. 6.1.
[23] *See*, 42 U.S.C. §7475(3).

94. Additionally, under the PSD program, new major sources or major modifications to existing sources must utilize Best Available Control Technology ("BACT") to limit emissions.[24]

95. Major sources of HAPs are subject to Maximum Achievable Control Technology ("MACT") standards, which are stringent pollution control requirements based on the technology used in the best-controlled sources in the industry. MACT standards significantly limit hazardous air pollutants, often reducing emissions to below the major source thresholds.[25]

96. After MACT standards are established, major sources of HAPs are also subject to a "residual risk program" under which the regulators evaluate health and environmental risks from the major source, and if necessary, impose additional risk-based standards.[26]

### ii. Defendants' Air Pollution Control Permit-to-Construct for Amite Facility

97. On June 8, 2012, Defendants submitted the Amite Facility's Application for an Air Pollution Control Permit-to-Construct Air Emissions Equipment to MDEQ. As it relates to VOCs, HAPs, and criteria pollutants, Defendants represented that the Amite Facility would be "a synthetic minor source under the federal Prevention of Significant Deterioration (PSD) as potential emissions of all criteria pollutants will be less than the 250 ton per year applicability threshold and non-biogenic greenhouse gas (GHG) emissions will be less than 100,000 tons per year" and that "the facility will also be a minor source of HAPs."[27]

98. On November 26, 2012, MDEQ issued the Defendants Air Pollution Control Permit-to-Construct Air Emissions Equipment Permit No. 0080-00031 for the Amite Facility. The Amite

---

[24] *See,* 42 U.S.C. 7475(4).

[25] *See,* 42 U.S.C. § 7412(g)(2).

[26] *See,* 11 Miss. Admin. Code, Pt. 2, Ch. 6.

[27] Amite BioEnergy LLC Facility, Application for Air Pollution Control Permit to Construct Air Emissions Equipment, Prepared by AMEC Environment & Infrastructure, Inc. (June 2012).

Facility continues to operate under this Air Construction Permit, modified on March 21, 2014, and then modified again on March 9, 2021.[28]

99. The Air Construction Permit specifies the volume and types of emissions allowed to be emitted from the Facility. Accordingly, emissions in excess of permit limits from emission points other than those identified in the permit and containing contaminants not listed in the permit are violations of the permit.

100. Since starting operations in 2015 through to the present, the Amite Facility has operated as a Title V major source without the necessary TVOP, in violation of the CAA. [29] [30]

101. Defendants submitted a TVOP application for the Amite Facility to MDEQ on March 8, 2022. After nearly three years of review, complicated and prolonged by additional compliance violations, the Amite Facility's Draft TVOP 0800-00050 was denied by the Mississippi Environmental Quality Permit Board on April 8, 2025.

### iii. Defendants Underestimated Amite Facility's Potential to Emit VOCs and Actual VOC Emissions.

102. Defendants' 2012 Air Construction Permit application for the Amite Facility erroneously alleged that only the chip dryer/biomass furnace at the Facility would emit VOCs, with a facility-wide estimate of 33.3 tpy of VOCs.[31]

---

[28] MDEQ, State of Mississippi Air Pollution Control Permit No. 0080-00031, issued Nov. 26, 2012, modified March 21, 2014, and March 9, 2021, attached hereto as Exhibit A.

[29] Mississippi Administrative Code Title 11, Part 2, Chapter 6: Mississippi Commission on Environmental Quality, Air Emissions Operating Permit Regulations for the Purposes of Title V of the Federal Clean Air Act (Adopted October 27, 1993, and Last Amended February 24, 2022).

[30] 40 CFR 71.1(b).

[31] Amite BioEnergy LLC Facility, Application for Air Pollution Control Permit to Construct Air Emissions Equipment, Prepared by AMEC Environment & Infrastructure, Inc. (June 2012), attached hereto and incorporated herein as Exhibit B.

103. Defendants significantly underestimated the Facility's potential VOC emissions because they did not include VOC emissions from other equipment at the Facility, including hammermills, pellet coolers and storage and handling from wood pellet manufacturing operations.[32]

104. Based on Defendants' representations that the Amite Facility was not a major source of VOCs, the Facility's permitted VOC emissions under the Air Construction Permit were set at the PSD Avoidance limit of 249.0 tpy (on a rolling 12-month total).

105. Defendants again underrepresented the Facility's PTE in the 2014 Air Construction Permit modification application to MDEQ. Defendants conceded that the Facility's post-dryer units emitted VOCs; however, they maintained that the facility-wide PTE of VOCs would be below the PSD major source threshold of 250 tpy.[33]

106. In August of 2016, Defendants submitted a TVOP application for the Amite Facility to MDEQ, asserting again that the Amite Facility would not emit VOCs in excess of the 250 tpy PSD major source threshold.[34]

107. The 2016 TVOP application relied on testing completed in 2010 at the Green Circle Bio Energy wood pellet facility in Florida ("Green Circle"). Utilizing Green Circle testing, Defendants calculated that the Amite Facility's proposed allowable Facility-wide emissions of VOCs would be 243.084 tpy.[35]

108. However, in 2013, Green Circle admitted that its 2010 tests were invalid and that its actual VOC emissions were five times greater than its 2010 emission estimates.

---

[32] *Id.*

[33] MDEQ, Permit Review Summary, Modification of Air Construction Permit No. 0080-00031 submitted January 29, 2014, for Amite BioEnergy, LLC, Wood Pellet Manufacturing Facility.

[34] Amite BioEnergy, LLC Facility, Title V Issuance Application, prepared by FC&E Engineering LLC (August 2016).

[35] Amite BioEnergy, LLC Facility, Title V Issuance Application, prepared by FC&E Engineering LLC (August 2016).

109. Moreover, on January 29, 2013, the Georgia Environmental Protection Division ("Georgia EPD") released a report after conducting an extensive investigation to establish accurate emission factors for large scale wood pellet facilities. Georgia EPD concluded that in addition to dryers there were significant amounts of VOC emissions from hammermills, pellet coolers and storage and handling from wood pellet manufacturing operations.[36]

110. Green Circle's updated findings and the Georgia EPD report were widely known in the wood pellet manufacturing industry. In fact, other states, including South Carolina and Alabama subsequently adopted Georgia EPD's emission factors in permitting and regulation of wood pellet manufacturing facilities.

111. Defendants, as subsidiaries of Drax Group, a biomass industry giant with pellet manufacturing mills all over the southeastern U.S., knew or should have known by the time of submittal of the Air Construction Permit modification application in January of 2014, that their VOC emission calculations were invalid and that the Amite Facility was emitting significantly more VOCs than they claimed.

112. In August of 2017, in response to MDEQ's issuance of a Draft TVOP for the Amite Facility, Environmental Integrity Project ("EIP") submitted comments which addressed both the debunked Green Circle testing and the conclusions of the Georgia EPD report.[37]

113. Accordingly, by August 2017, Defendants had actual notice that the methodology relied on for their VOC calculations was invalid, and that when applying proper methodology, Amite Facility's VOC emissions were that of a PSD major source.

---

[36] Memorandum from Manny Patel, Georgia EPD, to Eric Cornwell, Georgia EPD, entitled "Emission Factors for Wood Pellet Manufacturing," dated January 29, 2013, attached hereto as Exhibit C.

[37] EIP response to Amite BioEnergy August 2016 draft Title V Permit Application (August 14, 2017).

114. Instead of reassessing their VOC calculations, Defendants responded to EIP's comments by rejecting Georgia EPD's findings as too conservative for the Amite Facility and asserting that, in fact, their VOC emissions from the hammermills, pellet coolers and loadout of wood pellets were even lower than those estimated using the (invalid) Green Circle emission factors.[38]

115. Defendants claimed that stack testing completed at the Morehouse Facility, the Amite Facility's "sister facility," was "more appropriate for emission estimation purposes" and that "using the more representative Morehouse values due to similar operations of the Amite BioEnergy would result in estimated emissions of 163.5 tons of VOCs."

116. However, the Morehouse Facility testing was flawed, and Defendants' Morehouse Facility was out of compliance with its own air pollution permit and was issued multiple Notices of Violations ("NOVs") related to air quality violations, including VOC and HAP exceedances.

117. Defendants knew or should have known that their VOC emission estimates were erroneously low and that the application of the widely known and accepted updated methodology would yield significantly higher VOC estimates. Moreover, Defendants knew or should have known that accurate emission estimates should have been based on data from the Amite Facility, taking into account all of the Facility's VOC emitting processes, and not just the dryer.

118. From the time that the Amite Facility started operations in September 2015 through at least April 2022, its VOC emissions were high enough for the Facility to qualify as a major source under the PSD provisions of the CAA. Notwithstanding, Defendants underestimated and misrepresented the Facility's emissions, thereby evading being classified as a PSD major source, to the detriment of the surrounding Gloster community and the Plaintiffs.

---

[38] Amite BioEnergy LLC Draft Title V Permit Review, Response Letter to Comments from EIP to MDEQ (October 12, 2017).

119. Defendants knew or should have known that by misclassifying the Amite Facility as a synthetic minor source instead of a PSD major source they were evading numerous applicable CAA requirements, including the utilization of BACT to limit emissions[39] and the requirement to obtain a PSD permit.[40]

120. The PSD permit requires more rigorous monitoring and recordkeeping requirements, as well as additional agency reporting and oversight.

121. Furthermore, the PSD permitting process requires applicants to demonstrate that emissions from a facility will not cause or contribute to air pollution in excess of the NAAQS or any other applicable emission standard.[41] By underrepresenting VOC emissions and avoiding PSD major source classification, Defendants thus avoided the requirement to demonstrate compliance with the NAAQS.

122. Upon information and belief, the Amite Facility has the potential to cause or contribute to the exceedance of one or more NAAQS standards. This is particularly critical when the proximity of the Amite Facility to another PSD major source, a lumbermill operating 0.5-km (0.31-miles) to the northeast, is considered.

   iv.   **Defendants Exceeded the VOC Emission Limits of the Air Construction Permit.**

123. In November 2018, Defendants alerted MDEQ they were out of compliance with 11 Miss. Admin. Code Pt. 2, Ch. 2 (Permit Regulations for Construction and Operation of Air Emissions Equipment) and 11 Miss. Admin. Code Pt. 2, Ch. 5 (Regulations for the Prevention of Significant Deterioration of Air Quality) as they relate to the Facility's emissions.[42]

---

[39] *See*, 42 U.S.C. §7475(a)(4).
[40] *See*, 42 U.S.C. §7475(a)(1).
[41] *See*, 42 U.S.C. §7475(a)(3).
[42] Correspondence from Keith W. Turner, counsel for Defendants to Tim Aultman, P.E. Chief, Environmental Compliance and Enforcement Division, Office of Pollution Control, MDEQ (November 5, 2018) (regarding Amite BioEnergy).

124. On January 29, 2019, Defendants submitted a Semiannual Compliance Monitoring Report to MDEQ stating that "Amite BioEnergy is NOT certifying compliance with VOC emissions from all permitted emission sources or total facility VOC emissions."[43]

125. On February 22, 2019, Defendants submitted results of stack tests conducted at the Amite Facility, which revealed that the Facility's post-dryer units (which the Defendants consistently claimed were not major sources of VOCs) were in fact emitting significant amounts of VOCs. The stack testing revealed that Amite Facility was emitting an average of 795.58 tpy of VOCs, more than three times the 250 tpy major source threshold and more than three times the amount allowed under the Facility's Air Construction permit.[44]

126. On June 28, 2019, Defendants submitted via email "Amite Actual VOC Emissions Summary 2019 0628," disclosing that they had released the following VOC emissions: 366.34 tpy in 2016, 643.76 tpy in 2017, 720.83 tpy in 2018, and 303.62 tpy in January through May of 2019.[45]

127. On July 26, 2019, Defendants again submitted a Semiannual Compliance Monitoring Report to MDEQ stating that "Amite BioEnergy is NOT certifying compliance with VOC emissions from all permitted emission sources or total facility VOC emissions."[46]

---

[43] Correspondence from Michael Bellow, Director – Risk Management & EHS, Drax Biomass Inc., to Tim Aultman, P.E. Chief, Environmental Compliance and Enforcement Division, Office of Pollution Control (Jan. 29, 2019) (regarding the Semiannual Compliance Monitoring Report for Air Pollution Control Permit to Construct Air Emissions Equipment Permit No. 0080-00031).

[44] Correspondence from Sharon Killian, Principal Consultant, Trinity Consultants, to Thomas Tynes, Enforcement Branch Manager, MDEQ (Feb. 22, 2019) (submitting the Stack Test Report for Amite BioEnergy LLC), attached as Exhibit D.

[45] Correspondence from Keith Turner, Watkins & Eager PLLC, to Thomas Tynes, Enforcement Branch Manager, MDEQ (June 28, 2019), (Subject: Amite Actual VOC Emissions Summary 2019 0628 (002)), attached as Exhibit E.

[46] Correspondence from Brad Mayhew, Plant Manager, Amite BioEnergy LLC., to Tim Aultman, P.E. Chief, Environmental Compliance and Enforcement Division, Office of Pollution Control (July. 26, 2019) (regarding the Semiannual Compliance Monitoring Report for Air Pollution Control Permit to Construct Air Emissions Equipment Permit No. 0080-00031), attached as Exhibit F.

128. On January 9, 2020, MDEQ issued Defendants an NOV based on Amite Facility's excess VOC emissions. Violations included, among other things, Emission Point AA-001 (chip dryer) exceeding the VOC limit of 40 tpy since 2017, as well as the entire Amite Facility exceeding the VOC limit of 249.0 tpy since 2016.[47]

129. On November 4, 2020, MDEQ fined the Defendants $2.5 million for permit exceedances under Agreed Order No. 7082-20 based on violations outlined in the January 9, 2020 NOV.

130. In addition to the penalty, MDEQ also required that Defendants install additional pollution controls at the Facility, including a Regenerative Catalytic Oxidizer ("RCO"), a commercially available pollution control device designed to reduce VOCs and HAPs from industrial exhaust steams. Furthermore, MDEQ required Defendants to restrict wood pellet production beginning in September 2020 to reduce VOC emissions until the start-up of the RCO.[48]

131. From the time that it started production in September 2015, the Amite Facility was emitting more than three times the amount of VOCs that would trigger PSD major source requirements, including the assessment and installation of BACT to reduce emissions.[49] However, it was not until June of 2021 that the Defendants finally installed the RCO.

132. The Facility continued to vastly exceed the PSD major source threshold of 250 tpy VOCs until April of 2022, based on Semiannual Compliance Monitoring Reports submitted in 2021[50]

---

[47] *Mississippi Commission on Environmental Quality v. Amite BioEnergy, LLC*, Agreed Order No. 7082-20 (Nov. 4, 2020), attached as Exhibit G.

[48] *Id.*

[49] 42 U.S.C. §7475(a)(4).

[50] Semi-Annual Reporting for January through June 2021, and July through December 2021, Amite BioEnergy, LLC, Wood Pellet Manufacturing Facility (dated July 27, 2021 and January 28, 2022), attached as Exhibit H.

and 2022.[51] The most egregious exceedance identified was the rolling 12-month emission total reported for January 2021 at 985.126 tpy VOCs[52]

133. Upon information and belief, Defendants still have not demonstrated that the BACT has been installed and is being operated in such a manner to consistently achieve the best possible reduction in VOC emissions. Specifically, RTO and RCO emission controls have been set to varying efficiency during emission testing events, but not the maximum efficiency to effectively oxidize and limit air emission.[53]

134. Furthermore, Defendants have failed to properly monitor the emission control equipment for effectiveness, as evidenced by the NOV issued by MDEQ on January 8, 2024. In reference to monitoring the effective life of catalytic media in the RCO, the NOV states, "The facility conducted a laboratory analysis of the catalytic media to determine effective life; however, the required 'apparent density in grams per cubic centimeter and percent saturation' were not provided by the lab results methodology" and in reference to the RCO control system "The facility failed to timely conduct the subsequent performance test."[54]

135. Upon information and belief, the Amite Facility regularly experiences upset and emergency conditions during which the emission control equipment may be bypassed, and an increased amount of VOCs and HAPs are dispersed into the atmosphere and the Gloster community.

---

[51] Semi-Annual Reporting for January through June 2022, Amite BioEnergy, LLC, Wood Pellet Manufacturing Facility (dated July 21, 2022), attached as Exhibit I.

[52] Semi-Annual Reporting for January through June 2021, Amite BioEnergy, LLC, Wood Pellet Manufacturing Facility (dated July 27, 2021), attached as Exhibit J.

[53] Sanders Engineering & Analytical Services (2021) Tables 1 and VI 95.2% averaged RTO destruction efficiency and 97.1% averaged RCO destruction efficiency; Trinity (2022). Appendix A. Title V Air Permit Application: 96% oxidation system efficiency for the RTO and 96.30%. efficiency for the RCO.

[54] MDEQ Notice of Violation to Amite BioEnergy, LLC, Wood Pellet Manufacturing Facility, dated January 8, 2024, attached as Exhibit K.

136. The Defendants semiannual compliance monitoring reports submitted to MDEQ provide the total hours of control bypass venting attributed to startup/shutdown and idling, which are permitted activities, as well as hours Defendants refer to as "Venting at Full Capacity" or "Venting During Normal Operation."[55]

137. Upon information and belief, hours of "Venting at Full Capacity" occur during "emergency" or "malfunction" events, or times when they route emissions to the bypass vent outside of the authorized startup/shutdown/idle situations, causing excess emissions of VOCs and HAPs.

v. **Defendants Underestimated HAPs Released From their Facility, Evaded Identification as a HAP major source, and Exceeded HAP Limits of their Air Construction Permit.**

138. In their 2012 Application to MDEQ for the Air Construction Permit for the Amite Facility, in addition to underestimating their VOC emissions, Defendants alleged that the amount of HAPs emitted by the Amite Facility would be below the HAP major source threshold of 10 tpy of any single HAP, or 25 tpy of any combination of HAPs. As with VOCs, the application did not include HAP emissions from equipment downstream of the chip dryer/biomass furnace, estimating that the Amite Facility would release 10.8 tpy total HAPs.[56]

139. Based on the Defendants' representation that the Facility was not a major source of HAPs, the Air Construction Permit set the HAP limitations to 9.0 tpy for any individual HAP and 24.0 tpy for total HAPs based on rolling 12-month totals.

---

[55] Semiannual Monitoring Reports Submitted by Amite BioEnergy to Mississippi Department of Environmental Quality; dated 1/30/25, 1/22/24, 7/31/23, 1/27/23, 8/1/22, and 2/2/22.
[56] Amite BioEnergy LLC Facility, Application for Air Pollution Control Permit to Construct Air Emissions Equipment, Prepared by AMEC Environment & Infrastructure, Inc. (June 2012).

140. Classified as a minor source of HAPs, the Facility was not required to undergo a MACT analysis, which would have ensured that its HAPs emissions were reduced to the maximum extent possible.

141. Defendants added HAP emissions for downstream equipment in their 2014 Air Construction Permit modification application[57] and in the 2016 TVOP application, but continued to assert that the Facility was not a major source emitter of HAPs, representing that the Facility's PTE was 22.3896 tpy of total HAPs on a 12-month rolling basis.[58]

142. After the discovery of the VOC emission exceedances in 2019 and installation of the RCO in 2021, in July of 2021, the Amite Facility failed a mandatory compliance test for HAPs required by its Air Construction Permit.[59] The stack test revealed that the Amite Facility was operating as a major source of HAPs.[60]

143. In January of 2022, Defendants' consultant discovered during an audit of the emissions and stack tests results that the Amite Facility had further underestimated potential HAP emissions due to a throughput miscalculation and the exclusion of chip dryer methanol emissions from the HAP totals.[61]

---

[57] MDEQ, Permit Review Summary, Modification of Air Construction Permit No. 0080-00031 submitted January 29, 2014, for Amite BioEnergy, LLC, Wood Pellet Manufacturing Facility.

[58] Amite BioEnergy, LLC Facility, Title V Issuance Application, prepared by FC&E Engineering, LLC (August 2016).

[59] Letter from Amber Bouska, Vice President of Health, Safety, & Environmental North America, to Kenneth Pilgrim, P.E., Chief, Air II Branch, Environmental Compliance and Enforcement Division, Office of Pollution Control (March 30, 2023) (e-mail providing Drax's response to the March 14, 2023, Notice of Violation); *see also*, Trinity Consultants Permit to Construct Application (October 2021).

[60] *Id.*

[61] RE: March 14, 2023. Notice of Violation Response. March 30, 2023. Sent to Kenneth Pilgrim, P.E. MDEQ from Amber D. Bouska, Vice President of Health Safety & Environment North America Drax.

144. Stack testing conducted in 2022, once again showed that the Facility was releasing 49.42 tpy of HAPs into the atmosphere, over 50 percent of its permitted limit of HAPs, in violation of its Air Construction Permit.[62]

145. On March 14, 2023, MDEQ issued Defendants an NOV based violations of the Air Construction Permit and 11 Miss. Admin. Code Pt. 2, Ch. 2, R. 2.2.B(10) (Major Source Avoidance Limits), by exceeding the 24 tpy rolling 12-month total HAPs limits and the 9 tpy individual HAP limit for methanol, notwithstanding Defendants' installation of the RCO in June of 2021.[63]

146. According to the Amended NOV dated June 21, 2023, the Facility had not returned to compliance with individual HAP and total HAPs limits allowed by its Air Construction Permit.[64]

147. On September 11, 2024, MDEQ issued Defendants Agreed Order No. 7354-24, assessing civil penalties for the HAPs exceedances outlined in the 2023 NOV.[65] Defendants were fined $225,000.00 for exceeding the rolling 12-month individual HAP limit for methanol of 9 tpy during the 12-month periods ending March 2022 to December 2023 and the rolling 12-month total HAPs limit of 24.0 tpy during the 12-month periods ending April 2022 to November 2023 at Emission Point AA-000 (Facility-Wide). The Order noted several additional violations of the Air Construction Permit, including failure by the Defendants to timely conduct a subsequent performance test at Emission Point AA-301 (RCO control system) within twenty-five (25) months following the initial performance test; failure to document, maintain, and provide the required

---

[62] *Id.*

[63] Letter from Amber Bouska, Vice President of Health, Safety, & Environmental North America, to Kenneth Pilgrim, P.E., Chief, Air II Branch, Environmental Compliance and Enforcement Division, Office of Pollution Control (March 30, 2023) (e-mail providing Drax's response to the March 14, 2023, Notice of Violation).

[64] Amended Notice of Violations (Previously Issued March 14, 2023), dated June 21, 2023.

[65] *Mississippi Commission on Environmental Quality v. Amite BioEnergy, LLC*, Agreed Order No. 7354-24 (September 11, 2024), attached as <u>Exhibit L</u>.

inspection log records at Emission Points AA-300 (wood pellet operations) and AA-400 (finished pellet operations) for the period of March 9, 2021 to March 2023; and failure to monitor the effective life of the catalytic media in the RCO no later than sixteen (16) months after initial startup.

148. Although the Defendants were not fined until 2022, for exceeding their permitted HAP emissions limits, the stack testing results and emissions data from similar facilities establish that they were dramatically exceeding their permitted limits for HAPs since starting operations in 2015. Additionally, because a large percentage of VOCs emitted by the Amite Facility are also HAPs, Defendants' years of excess VOC emissions resulted in vast amounts of unpermitted HAP emissions.

149. Defendants knew or should have known that their HAP emission estimates were erroneously low and that their PTE and actual HAP emissions were at the levels of a major source for HAPs.

150. Reliable HAP testing for the wood pellet industry was readily available. Additionally, upon information and belief, Defendants had access to data released by Enviva, the largest pellet manufacturer in the world. That data included HAP emissions data based on stack tests at Enviva's wood-pellet plants comparable to the Amite Facility.[66]

151. Moreover, by August of 2017, Defendants had actual notice of Georgia EPD's report. In addition to VOCs, the report also addressed HAP emissions, concluding that in addition to being a byproduct of the drying process, HAPs are also emitted from hammermills, pellet coolers and storage handling operations.[67]

---

[66] *See,* comment; Enviva - Compliance History | South Carolina Department of Environmental Services (sc.gov) fn 6.

[67] Amite BioEnergy LLC Draft Title V Permit Review, Response Letter to Comments from EIP to MDEQ (October 12, 2017).

152. The identification of the Facility's status as a HAP major source in 2021 triggered a case-by-case MACT analysis to determine the maximum HAP reduction possible using existing technologies and the method of achieving it. [68][69] In conjunction with the MACT analysis, MDEQ required Defendants to conduct an air dispersion modeling assessment of HAPs from the Amite Facility to demonstrate that their emissions do not have the potential to negatively impact the health of residents of Gloster.[70]

153. In January 2024, Defendants submitted an Air Toxics Modeling Report to MDEQ alleging that Amite Facility's "emissions of air toxics are at such rates to not adversely affect human health."[71] However, only four HAPs (acetaldehyde, formaldehyde, methanol, and phenol) were modeled despite the Facility representing emissions of 27 different HAPs in its 2022 TVOP application.[72]

154. While incomplete, and significantly flawed, Defendants' model in fact demonstrates that the four HAPs that were modeled are present at ground level, encompassing Plaintiffs' properties.

155. The levels of HAPs entering the Gloster community from the Amite Facility have and will continue to negatively affect the health of Gloster residents, including the Plaintiffs.

**vi. Defendants' Actions Violate Mississippi Law and the CAA.**

---

[68] *See*, 40 CFR Part 63, Subpart B - Requirements for Control Technology Determinations for Major Sources in Accordance With Clean Air Act Sections 112(g) and 112(j).

[69] Correspondence from Jaricus Whitlock, Air Division Chief, Mississippi Department of Environmental Quality to Wayne Kooy, Director of Environmental, Amite BioEnergy, LLC, Re: Air Toxics Impact Analysis and Additional Info. Required; October 13, 2023.

[70] *Id.*

[71] PPM Consultants, Inc., Air Toxics Modeling Report, Amite BioEnergy, LLC, dated January 2024.

[72] Trinity Consultants, Title V Air Permit Application, Amite BioEnergy LLC, Gloster, MS, February 2022.

156. The CAA, implemented through the Mississippi SIP, imposes strict emission limits on VOCs and HAPs that the Defendants had to comply with pursuant to the conditions of their Air Construction Permit.

157. Pursuant to 11 Miss. Admin. Code Pt. 2, Ch.2, R. 2.2.B(10), which outlines major source avoidance limits, Defendants' Air Construction Permit outlined limitations for VOC and HAP emissions.

158. From the time it started operating, the Amite Facility has repeatedly emitted VOCs and HAPs in quantities exceeding the emission limits set forth in the Facility's Air Construction Permit, and in excess of the PSD and HAP major source thresholds established pursuant to 42 U.S.C. §7479 and 42 U.S.C. §7412(1) of the CAA.

159. As determined by MDEQ, as outlined in the enforcement documents discussed above, by violating the emissions limitations of their Air Construction Permit, Defendants also violated the Mississippi SIP, including 11 Miss. Admin. Code Pt. 2, Ch. 2, R.2.2.B(10).

160. Defendants' violations of their Air Construction Permit and regulations adopted as part of the Mississippi SIP are also violations of the CAA.

161. Defendants failed to adequately address safety considerations given the Facility's proximity to residential neighborhoods.

162. Defendants consistently underrepresented the quantity of VOCs and HAPs and avoided PSD and MACT requirements by falsely claiming that they were minor sources of these pollutants.

163. Defendants have and continue to release hundreds of tons of extremely hazardous VOCs and HAPs to the atmosphere, exposing the surrounding residents, including the Plaintiffs, to these hazards for years.

**vii. Air Quality Violations at Defendants' Other Facilities**

- 33 -

164. Defendants' operation of the Morehouse Facility, the Amite Facility's "sister facility," gave additional notice to the Defendants as to hazardous air emissions that would be released during the operation of their Amite Facility and the need to institute emissions and management controls to reduce their impacts on the Gloster community. Furthermore, the ongoing air quality violations at the Defendants' Morehouse Facility further evidence Drax Defendants' chronic disregard for the health and safety of the residents of the communities surrounding Drax's wood pellet manufacturing operations.

165. Defendants' Drax Morehouse Facility opened in approximately 2015 and currently operates under Title V permit 1920-00018-V5, issued October 21, 2021, and Prevention of Significant Deterioration (PSD) permit PSD-LA-836, issued on May 13, 2021. Like the Amite Facility, the Morehouse Facility was originally permitted as a minor source under the PSD program, until stack testing in October 2018 showed emissions were above the 250 tpy PSD major source threshold for VOCs.[73]

166. Since it started operations, the Morehouse Facility has continuously violated its Air Permit and the CAA. The Louisiana Department of Environmental Quality ("LDEQ") has issued the Morehouse Facility NOVs on May 23, 2017 (No. AE-CN-16-00436),[74] June 13, 2018 (No. RE-CN-15-00240),[75] June 13, 2019 (No. AE-CN-18-00538),[76] April 8, 2020 (AE-CN-18-00538A), and July 20, 2020 (AE-CN-18-00538B) based on the facility's numerous air quality

---

[73] Trinity Consultants, Inc., PSD Application for Morehouse BioEnergy LLC, dated August 9, 2019.

[74] LDEQ, Morehouse BioEnergy Consolidated Compliance Order & Notice of Potential Penalty, Enforcement Tracking No. AE-CN-16-00436 (May 23, 2017).

[75] LDEQ, Morehouse BioEnergy Consolidated Compliance Order & Notice of Potential Penalty, Enforcement Tracking No. RE-CN-15-00240 (June 13, 2018).

[76] LDEQ, Morehouse BioEnergy Consolidated Compliance Order & Notice of Potential Penalty, Enforcement Tracking No. AE-CN-18-00538, A, B, June 13, 2019, amended April 8, 2020, and amended July 20, 2020.

violations. The May 23, 2017, June 13, 2018, and June 13, 2020, NOVs in particular were based on the facility repeatedly exceeding emission limits for HAPs (including formaldehyde, acetaldehyde and methanol) and VOCs. These violations resulted in the imposition of fines of $20,000, on February 3, 2020, and $1.6 million September 19, 2022.[77]

167. Stack testing was conducted for the Morehouse Facility RTO and RCO in August 2023. The results were not submitted to LDEQ until February 13, 2024. Based on the August 2023 stack tests, the emission rates from the Morehouse Facility were above the currently authorized levels in their PSD permit.[78]

168. On January 24, 2025, the Morehouse Facility was issued Compliance Order and Notice of Potential Penalty ("CONOPP") No. MM-CN-20-00539.[79] The CONOPP cites an extensive list of environmental violations related to air, waste, and water from January 2019 through December 2023.

169. Defendants' LaSalle facility located in Urania, LaSalle Parish, Louisiana (the "LaSalle Facility"), opened in 2017 and currently operates under Title V Air Permit No. 1680-00097-V2, issued in August 2018. Like Defendants' Amite Facility and Morehouse Facility, the LaSalle Facility has continuously violated the conditions of its Title V Air Permit and the CAA. LDEQ has issued the LaSalle Facility NOVs on October 30, 2019 (No. AE-CN-19-00961)[80], November

---

[77] State of Louisiana Department of Environmental Quality Settlement In the matter of: Morehouse BioEnergy LLC, Settlement Tracking No. SA-AE-22-0039.

[78] LDEQ Office of Environmental Quality; Consolidated Compliance Order & Notice of Potential Penalty issued to Morehouse BioEnergy, LLC; Enforcement Tracking No. MM-CN-20-00539, dated January 24, 2025.

[79] LDEQ Office of Environmental Quality; Consolidated Compliance Order & Notice of Potential Penalty issued to Morehouse BioEnergy, LLC; Enforcement Tracking No. MM-CN-20-00539, dated January 24, 2025.

[80] LDEQ, LaSalle BioEnergy Consolidated Compliance Order & Notice of Potential Penalty, Enforcement Tracking No. AE-CN-19-00961 (October 30, 2019).

14, 2019 (MN-CN-17-00980), October 27, 2020 (SE-CN-20-00592),[81] and November 17, 2021 (MN-CN-17-00980A)[82] for numerous air quality violations. The October 30, 2019, NOV was based specifically on VOC emission limit exceedances at multiple emission points at the LaSalle Facility. On September 19, 2022, LDEQ imposed a $1.6 million fine on Drax's LaSalle Facility.[83]

## C. Defendants' Operations Exposed the Gloster Community and the Plaintiffs to Dangerous Pollutants with Established Adverse Impacts on Human Health.

170. The Amite Facility produces visible air pollution, in the form of smoke, soot, wood dust, and PM.

171. The Amite Facility has emitted and continues to emit a wide range of pollutants known to be carcinogenic, mutagenic, and otherwise correlated with adverse impacts to human health. These include dangerous levels of VOCs, HAPs (including formaldehyde, hydrochloric acid, acetaldehyde, methanol, benzene, and acrolein), particulate matter less than 10 microns in diameter ($PM_{10}$), particulate matter less than 2.5 microns in diameter ($PM_{2.5}$), NOx, CO, and $SO_2$. In addition, the Facility emitted and continues to emit significant amounts of wood dust, a type of particulate matter that is a known carcinogen.

172. The Amite Facility currently utilizes a WESP, RTO, and RCO (installed in 2021) to control and oxidize these emissions to varying degrees during normal operating conditions, prior to the emission exiting the stack into the ambient air. Despite these controls, the Defendants have been unable to meet the emission limits of their Air Construction Permit since beginning operations in 2015.

---

[81] LDEQ, LaSalle BioEnergy, Consolidated Compliance Order & Notice of Potential Penalty, Enforcement Tracking No. SE-CN-20-00592 (November 14, 2019).

[82] LDEQ, LaSalle BioEnergy, Consolidated Compliance Order & Notice of Potential Penalty, Enforcement Tracking No. MN-CN-17-00980 (November 14, 2019).

[83] State of Louisiana Department of Environmental Quality Settlement In the Matter of: LaSalle BioEnergy LLC, Settlement Tracking No. SA-MM-22-0040.

173. Fugitive and controlled emissions from the stacks entering the atmosphere from the Facility are transported by the wind through dispersion to the adjacent Gloster community.

174. VOCs, HAPs and other pollutants dispersed into the atmosphere are transported in their gaseous states through dry deposition (direct settling) or wet deposition (washed out by precipitation). Additionally, these gases attach to the wood dust and other particulate matter emitted from the Facility. Once these pollutants are adsorbed onto PM, they can be transported over long distances by air currents. Eventually, the particulate matter, along with the adsorbed pollutants, settle out of the air and deposit onto Plaintiffs' properties, either through dry or wet deposition.

### i.   Volatile Organic Compounds (VOCs)

175. VOCs are gases which may adversely affect the health of those exposed to them in the short and long-term. VOCs combine with NOx and sunlight to create ground level ozone and smog. Breathing ground level ozone is harmful for any person, but especially for the elderly, children, and those with health issues like asthma. VOCs also directly cause breathing difficulty and irritation to the respiratory system. VOCs emitted by wood pellet plants, including the Amite Facility, also contain numerous chemicals that are also classified as HAPs.

176. Defendants' unlawful emissions of excess VOCs into the atmosphere contributed to elevated levels of VOCs, ground level ozone, and smog in the area surrounding the Amite Facility, including the Gloster community and Plaintiffs' properties.

### ii.   Hazardous Air Pollutants (HAPs)

177. HAPs, also known as air toxics, are those substances which are known or suspected to cause cancer or other serious side effects such as birth defects. Specifically, HAPs are pollutants that Congress has listed as toxic or carcinogenic even in small qualities. HAPs emitted from the Amite Facility include acetaldehyde, acrolein, formaldehyde, methanol, phenol, and benzene.

- 37 -

178. Many of the HAPs emitted by the Amite Facility are also VOCs. These include formaldehyde, acetaldehyde, methanol, acrolein and benzene.

### iii. Acetaldehyde

179. According to EPA Toxic Release Inventory ("TRI") Reporting, the Amite Facility released 7,085 pounds of acetaldehyde into the atmosphere in 2019, 10,424 pounds in 2020, 7,342 pounds in 2021, and 6,695 pounds in 2022. An estimated acetaldehyde emission of 7,030 pounds was made for 2023 and 7,381 pounds for 2024.[84]

180. The primary acute effect of inhalation exposure to acetaldehyde is irritation of the eyes, skin, and respiratory tract in humans. At higher exposure levels, erythema, coughing, pulmonary edema, and necrosis may also occur. EPA has classified acetaldehyde as a Group B2, probable human carcinogen.

181. Upon information and belief, using the Defendants' most recent proposed emission limits, chronic exposure to the level of acetaldehyde released from the Amite Facility has the potential to cause an increased risk of negative human health impacts.

### iv. Formaldehyde

182. According to EPA TRI Reporting, the Amite Facility released 19,202 pounds of formaldehyde into the atmosphere in 2019, 14,634 pounds in 2020,[85] 13,671 pounds in 2021, and 12,256 pounds in 2022. An estimated formaldehyde emission of 12,869 pounds was made for 2023 and 13,512 for 2024.

---

[84] US EPA TRI Explorer, *Amite Bioenergy, LLC Facility Profile Report* (2022), https://enviro.epa.gov/triexplorer/release_fac_profile?TRI=3963WMTBNRGERGI&TRILIB=T RIQ1&FLD=&FLD=RELLBY&FLD=TSFDSP&YEAR=2018 (last visited Aug. 1, 2024).
[85] EPA National Emission Inventory ("NEI") data list the 2020 formaldehyde emissions for the Amite Facility as 21,820 pounds.

183. High levels of exposure to formaldehyde can cause health problems when inhaled and if it is absorbed into the skin. Inhaling high levels of formaldehyde for a short period of time can cause sensory irritation such as eye irritation. Inhaling formaldehyde for longer periods of time can damage the lungs and increase asthma and allergy-related conditions, sensory irritation, reproductive toxicity, and cancer.

184. Upon information and belief, using the Defendants' most recent proposed emission limits, chronic exposure to the level of formaldehyde released from the Amite Facility has the potential to cause an increased risk of negative human health impacts. Furthermore, there is the potential for negative health impacts as a result of acute, or short-term, exposure to formaldehyde from the Amite Facility.

**v.    Methanol**

185. According to EPA TRI Reporting, the Amite Facility released 6,990 pounds of methanol into the atmosphere in 2019, 10,330 pounds in 2020, 34,890 pounds in 2021, and 31,598 pounds in 2022. An estimated emission of 33,178 pounds was made for 2023 and 34,837 pounds for 2024.

186. Acute exposure of humans to methanol by inhalation or ingestion may result in visual disturbances, such as blurred or dimness of vision, leading to blindness. Neurological damage, specifically permanent motor dysfunction, may also result. Chronic inhalation or oral exposure to methanol may result in headache, dizziness, giddiness, insomnia, nausea, gastric disturbances, conjunctivitis, visual disturbances (blurred vision), and blindness.

**vi.    Acrolein**

187. EPA National Emissions Inventory ("NEI") database lists the 2020 acrolein emissions for the Amite Facility as 0.2317 tons or 510 pounds. In the most recently available Semiannual

Monitoring Report submitted to MDEQ, the Amite Facility reports releasing 0.4616 tons or 923 pounds of acrolein.[86]

188. Acrolein is a known toxic substance, with a Department of Transportation Hazard Class of 6.1 (poison) and regulated by United States Occupational Safety and Health Administration and cited by the American Conference of Governmental Industrial Hygienist, the National Institute for Occupational Safety and Health, the International Agency for Research on Cancer ("IARC") and EPA. Acrolein enters the body through the lungs and by passing through the skin. Low levels of acrolein in the air can cause eye, nose, throat, and lung irritation, as well as cough, chest tightness, and shortness of breath. Higher levels of exposure to acrolein may cause fluid in the lungs, which may lead to death. Over time, respiration dysfunction may persist.

189. Upon information and belief, using the Defendants' most recent proposed emission limits, chronic exposure to the level of acrolein released from the Amite Facility has the potential to cause an increased risk of negative human health impacts.

### vii.    Phenol

190. The most recently submitted semiannual compliance monitoring report for the Amite Facility indicates that 0.417 tons or 834 pounds of phenol were emitted in 2024.[87]

191. Acute inhalation of Phenol is known to affect the eyes and respiratory system. Chronic Phenol exposure can damage the kidneys and negatively affect the alimentary, cardiovascular, and nervous systems.

### viii.    Benzene

---

[86] Semi-Annual Reporting for Amite BioEnergy, LLC, Wood Pellet Manufacturing Facility (dated January 30, 2025).

[87] Semiannual Monitoring Report Submitted by Amite BioEnergy to Mississippi Department of Environmental Quality; dated January 30, 2025.

192. EPA NEI lists the 2020 benzene emissions for the Amite Facility as 0.2432 tons or 536 pounds. The Amite Facility reported releasing 0.2914 tons or 583 pounds of benzene in 2024, based on the most recently available Semiannual Monitoring Report submitted to MDEQ.[88]

193. Acute inhalation exposure of humans to benzene may cause drowsiness, dizziness, headaches, as well as eye, skin, and respiratory tract irritation, and, at high levels, unconsciousness. Chronic inhalation of certain levels of benzene causes disorders in the blood in humans. Benzene specifically affects bone marrow (the tissues that produce blood cells). Aplastic anemia, excessive bleeding, and damage to the immune system may develop.[89]

ix. **Nitrogen Oxides**

194. EPA NEI data list the 2020 NOx emissions for the Amite Facility as 201.8 tons or 444,914 pounds. The Amite Facility reported releasing 73.214 tons or 146,428 pounds of NOx in 2024, based on the most recently available Semiannual Monitoring Report submitted to MDEQ.[90]

195. Nitrogen Oxides refers to a group of gases made of nitrogen and oxygen and includes nitrogen dioxide ("$NO_2$"). Breathing air with a high concentration of $NO_2$ can irritate airways in the human respiratory system. Such exposures over short periods can aggravate respiratory diseases, particularly asthma, leading to respiratory symptoms (such as coughing, wheezing or difficulty breathing), hospital admissions and visits to emergency rooms. Longer exposures to elevated concentrations of $NO_2$ may contribute to development of asthma and increased susceptibility to respiratory infections. People with asthma, as well as children and the elderly, are generally at greater risk for the health effects of $NO_2$. $NO_2$ along with other $NO_x$ reacts with

---

[88] Semi-Annual Reporting for Amite BioEnergy, LLC, Wood Pellet Manufacturing Facility (dated January 30, 2025).
[89] *Benzene*, U.S. EPA, https://www.epa.gov/sites/default/files/2016-09/documents/benzene.pdf.
[90] Semi-Annual Reporting for Amite BioEnergy, LLC, Wood Pellet Manufacturing Facility (dated January 30, 2025).

other chemicals in the air to form both PM and $O_3$. Both are also harmful when inhaled due to effects on the respiratory system.

196. The EPA has established one-hour and annual NAAQS standards for $NO_2$ intended to protect public health and welfare. By underrepresenting VOC emissions and avoiding PSD major source classification, Defendants avoided the requirement to demonstrate compliance with the $NO_2$ NAAQS.

197. Upon information and belief, operation of the Amite Facility has the potential to cause or contribute to the exceedance of the one-hour NAAQS for $NO_2$.

x.    **Particulate Matter**

198. EPA NEI data list the 2020 $PM_{2.5}$ emissions for the Amite Facility as 95.81 tons or 211,258 pounds. The Amite Facility reported releasing 18.16 tons or 36,320 pounds of $PM_{2.5}$ in 2024, based on the most recently available Semiannual Monitoring Report submitted to MDEQ.[91]

199. EPA NEI lists the 2020 $PM_{10}$ emissions for the Amite Facility as 98.51 tons or 217,166 pounds. The Amite Facility reported releasing 26.083 tons or 52,166 pounds of $PM_{10}$ in 2024, based on the most recently available Semiannual Monitoring Report submitted to MDEQ.[92]

200. PM, also called particle pollution, is the term for a mixture of solid particles and liquid droplets found in the air. Some particles, such as dust, dirt, soot, or smoke, are large or dark enough to be seen with the naked eye. Others are so small they can only be detected using an electron microscope. PM contains microscopic solids or liquid droplets that are so small that they can be inhaled and cause serious health problems. Particles vary widely in size, shape and chemical composition, and may contain inorganic ions, metallic compounds, elemental carbon,

---

[91] Semi-Annual Reporting for Amite BioEnergy, LLC, Wood Pellet Manufacturing Facility (dated January 30, 2025).
[92] Semi-Annual Reporting for Amite BioEnergy, LLC, Wood Pellet Manufacturing Facility (dated January 30, 2025).

organic compounds, and compounds from the earth's crust. Some particles less than 10 micrometers in diameter ($PM_{10}$) can get deep into lungs and the bloodstream. Of these, particles less than 2.5 micrometers in diameter ($PM_{2.5}$), also known as fine particles, pose the greatest risk to health. Airborne PM is not a single pollutant but rather is a mixture of many chemical species and compounds [93] such as benzene, ethylene glycol, formaldehyde, and lead, among others, released by the Amite Facility.[94]

201. Particle pollution released by the Amite Facility serves as a major transport mechanism for other toxic chemicals emitted from the Facility, including VOCs and HAPs.

202. The EPA has established 24-hour NAAQS for $PM_{10}$ and $PM_{2.5}$, as well as an annual NAAQS for $PM_{2.5}$, intended to protect public health and welfare. By underrepresenting VOC emissions and avoiding PSD major source classification, Defendants avoided the requirement to demonstrate compliance with the $PM_{10}$ and $PM_{2.5}$ NAAQS.

203. Upon information and belief, operation of the Amite Facility has the potential to cause or contribute to an exceedance of the NAAQS for 24-hr $PM_{10}$, and 24-hr and annual $PM_{2.5}$.

**xi.    Wood Dust**

204. Since the Defendants commenced their operations, Plaintiffs' residences have been regularly and repeatedly coated in wood dust. Wood dust is a type of particulate matter. Wood dust and other PM released by the Facility settle on the exteriors of Plaintiffs' homes and buildings, as well as lawns, recreational items and vehicles. These pollutants also migrate inside homes and buildings, where they settle in interior living and working spaces.

---

[93] *Particulate Matter and Health (PM2.5 and PM10)*, CA Air Resources Board, https://ww2.arb.ca.gov/resources/inhalable-particulate-matter-and-health (last visited May 20, 2024).

[94] Prakash Thangavel, et. al, *Recent Insights into Particulate Matter (PM2.5)-Mediated Toxicity in Humans: An Overview*, NATIONAL LIBRARY OF MEDICINE, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9223652/ (last visited May 20, 2024).

- 43 -

205. Exposure to wood dust has been associated with health issues due to the natural chemicals in wood or substances in the wood, such as bacteria, molds, or fungi. Wood dust is considered carcinogenic to humans (Group 1) according to the IARC. IARC states that wood dust causes cancer of the nasal cavity (nose area) and paranasal sinuses (spaces in and around the nasal cavity) and of the nasopharynx (upper part of the throat, behind the nose). Wood dust is also associated with toxic effects, irritation of the eyes, nose and throat, dermatitis, and respiratory system effects which include decreased lung capacity and allergic reactions.

206. Defendants knew or should have known that the VOCs, HAPs, NOx, and PM that the Amite Facility has been illegally releasing into the atmosphere for nearly a decade, would be transported to the Gloster community, and onto and into Plaintiffs' properties, permeating the air that the Plaintiffs breathe, and harming Plaintiffs' health and properties.

**xii.    Noise Pollution**

207. In addition to emitting large amounts of dangerous air pollutants identified above, 24-hour operations at the Amite Facility also create ongoing noise pollution.

208. Noise pollution occurs when unwanted sounds enter the environment. The potential health effects of noise pollution include increased stress levels, sleep disturbance, or hearing damage.[95]

209. Defendants knew or should have known that the noise levels emanating from the 24-hour operations of the Amite Facility would interfere with Plaintiffs' use and enjoinment of their properties.

**D. Damages to Plaintiffs Caused by Defendants' Acts and Omissions**

---

[95] Helen Millar, *What are the Health Effects of Noise Pollution?*, Medical News Today (Dec. 22, 2020), https://www.medicalnewstoday.com/articles/noise-pollution-health-effects.

210. Defendants' tortious conduct has caused Plaintiffs to suffer harm, injuries, and damages including, but not limited to those identified below.

211. The releases of VOCs, HAPs, PM and other pollutants have physically intruded, and continue to intrude, contaminated, and continue to contaminate, and have damaged, and continue to damage Plaintiffs' properties, interfere with Plaintiffs' property rights and harm Plaintiffs' health.

212. Defendants' actions and inactions in creating these conditions were a substantial factor in causing Plaintiffs to suffer economic and non-economic damages unique to each Plaintiff (and different from damages suffered by other Plaintiffs).

213. Defendants' conduct has damaged the properties and possessory interests of Plaintiffs, causing contamination of the air, soil, structures and other parts of properties that Plaintiffs occupy and visit. The levels of contamination would not be present but for the actions of the Defendants.

214. Plaintiffs have suffered and will continue to suffer damages and losses including a substantial decrease in the value and marketability of their properties; the need for and the cost of remediating and mediating their properties, including the cost of air filtration; and other economic damages.

215. Plaintiffs have suffered and will continue to suffer the loss of exclusive possession of their properties.

216. Plaintiffs have suffered, and will continue to suffer annoyance, interference, inconvenience, and discomfort.

217. Plaintiffs have suffered and will continue to suffer the loss of use and enjoyment of their properties, including, but not limited to, having to remain inside their homes and forego the use of their yards; having to keep doors and windows closed; and running air conditioning systems continuously when weather conditions otherwise would not so require. Plaintiffs are reluctant to

invite guests to their homes and are experiencing physical discomfort, irritation, sleep disturbances, and respiratory symptoms.

218. Additionally, due to their constant and ongoing exposure to dangerous levels of VOCs, HAPs, PM and other emissions from the Amite Facility (for some Plaintiffs, that exposure spanning for nearly a decade), Plaintiffs suffered substantial discomfort, including difficulty breathing, sneezing, coughing, congestion, headaches, nose bleeds, nausea, lightheadedness, dizzy spells, eye irritation, and other ailments.

219. Defendants' conduct in releasing unpermitted amounts of hazardous air pollutants for nearly a decade was willful or wanton, and it was done with conscious disregard and indifference to the rights and safety of others, including Plaintiffs, which the Defendants knew or should have known was reasonably likely to result in injury, damage or other harm.

## V. SERVICE OF NOTICE OF INTENT TO SUE PURSUANT TO THE CAA

220. On February 11, 2025, Plaintiffs served a Notice of Intent to Sue ("Notice") pursuant to the CAA, 42 U.S.C. § 7604(b)(1)(A), on the Defendants. A copy of this Notice is attached as Exhibit M.

221. The Notice was also served on the Administrator and Regional Administrator of the EPA, Region 4, the Attorney General of the United States, and Chris Wells, the Executive Director of MDEQ.

222. More than 60 days have elapsed since the notices described above were properly served, and neither EPA nor MDEQ has commenced diligent prosecution of a civil or criminal action in court to address the violations.

223. Defendants have done nothing to stop or reduce their continuing discharge of unpermitted VOCs and HAPs that occur each day that the Facility operates.

224. Defendants, in spite of being a major source emitter defined under the CAA and Mississippi SIP that is subject to PSD requirements, have failed to obtain and operate within the parameters of a TVOP for over a decade.

## VI.    CLAIMS FOR RELIEF

## COUNT I: VIOLATIONS OF PERMIT LIMITS ON FACILITY-WIDE HAP EMISSIONS

225. Plaintiffs reallege and reaffirm the allegations set forth in paragraphs 1-224 as if fully stated herein.

226. Under the CAA, any person may commence a civil action against a person who owns, leases, operates, controls, or supervises an emission source that is alleged to have violated an "emission standard or limitation." 42 U.S.C. § 7604(a)(1).

227. Defendants own, operate, control, and supervise the Amite Facility, within the meaning of 42 U.S.C. § 7604.

228. On multiple occasions Defendants' Amite Facility emitted HAPs in quantities that violated the emission limits set forth in the Amite Facility's Air Construction Permit.

229. By violating the conditions of their Permit, Defendants also violated Mississippi law, including but not limited to 11 Miss. Admin. Code Pt. 2, Ch. 2, R. 2.2B(10), which outlines major source avoidance limits, and requires that permittees comply with the emissions limitations of their permits.

230. Defendants' violations of the Amite Facility's Air Construction Permit, the Mississippi SIP, and the CAA are continuing and intermittent.

231. As a result of the foregoing conduct, Plaintiffs are entitled to injunctive relief, the assessment of civil penalties under the CAA, reasonable costs of litigation including attorneys' fees and expert witness fees, and all other relief which the Court deems just and proper.

## COUNT II: VIOLATIONS OF PERMIT LIMITS
## ON FACILITY-WIDE VOC EMISSIONS

232. Plaintiffs reallege and reaffirm the allegations set forth in paragraphs 1-231 as if fully stated herein.

233. Under the CAA, any person may commence a civil action against a person who owns, leases, operates, controls, or supervises an emission source that is alleged to have violated an "emission standard or limitation." 42 U.S.C. § 7604(a)(1).

234. Defendants own, operate, control, and supervise the Amite Facility, within the meaning of 42 U.S.C. § 7604.

235. On multiple occasions, Defendants' Amite Facility emitted VOCs in quantities that violated the emission limits set forth in the Amite Facility's Air Construction Permit.

236. By violating the conditions of the Amite Facility's Air Construction Permit, Defendants also violated Mississippi law, including but not limited to 11 Miss. Admin. Code Pt. 2, Ch. 2, R. 2.2B(10), which outlines major source avoidance limits, and requires that permittees comply with the emissions limitations of their permits.

237. Defendants' violations of the Amite Facility's Air Construction Permit, Mississippi SIP and the CAA are continuing and intermittent.

238. As a result of the foregoing conduct, Plaintiffs are entitled to injunctive relief, the assessment of civil penalties under the CAA, reasonable costs of litigation including attorneys' fees and expert witness fees, and all other relief which the Court deems just and proper.

## COUNT III: NEGLIGENCE

239. Plaintiffs reallege and reaffirm the allegations set forth in paragraphs 1-238 as if fully stated herein.

240. Defendants owed Plaintiffs a duty of reasonable care in performing their operations in a manner that would not unreasonably endanger human health and would not harm the Plaintiffs' properties and their property rights. This duty included but is not limited to 1) understanding, calculating and disclosing the Facility's potential to emit harmful air pollutants, including VOCs and HAPs and 2) controlling, minimizing and eliminating releases of all air pollutants from the Facility.

241. Defendants breached their duty of care to the Plaintiffs by failing to conduct their operations in a manner that would not interfere with Plaintiffs' properties and their property rights. Specifically, 1) Defendants failed to understand, calculate, and disclose the Amite Facility's potential to emit air pollutants, including VOCs and HAPS, as well as the Facility's actual emissions once operations started, thereby evading being categorized as a major source of emissions under the CAA and Mississippi law, which would have required Defendants to take steps that would have reduced and eliminated the impacts of their operation on Plaintiffs' properties and property rights and 2) Defendants failed to control, minimize and eliminate releases of excess amounts of dangerous air pollutants, including VOCs, HAPs and PM from the Facility from the time the Facility started operations through the present.

242. Defendants exercised exclusive control over the operation of the Amite Facility. In the normal course of events, and if the Defendants exercised reasonable care, the excess air pollution would not be released from the Facility.

243. Defendants' negligence has caused contamination of Plaintiffs' real and personal property and caused annoyance and discomfort, inconvenience, interference, loss of use and enjoyment, and diminution of property values.

244. The harm to the Plaintiffs was reasonably foreseeable.

245. Defendants' actions were the proximate cause of the Plaintiffs' injuries.

246. Defendants' conduct amounts to gross negligence. Defendants conducted their operations with full knowledge that they were releasing dangerous chemicals that posed a significant risk to human health into the surrounding Gloster community. Accordingly, their actions were willful, wonton, and committed with a reckless disregard for the Plaintiffs' rights and safety, justifying an award of punitive damages.

247. As a direct and proximate result of the Defendants' negligence, Plaintiffs have suffered damages and losses including, but not limited to, diminution of the value and marketability of their properties and their property rights; the loss of use of their properties; the loss of use and enjoyment of their properties; and discomfort, inconvenience and annoyance. Accordingly, Defendants are liable for compensatory and punitive damages to the Plaintiffs.

## COUNT IV: NEGLIGENCE *PER SE*

248. Plaintiffs reallege and reaffirm the allegations set forth in paragraphs 1-247 as if fully stated herein.

249. On multiple occasions, Defendants' Amite Facility emitted VOCs and HAPs in quantities that violated the emission limits set forth in the Amite Facility's Air Construction Permit.

250. By violating the conditions of the Amite Facility's permit, Defendants also violated Mississippi law, including but not limited to 11 Miss. Admin. Code Pt. 2, Ch. 2, R. 2.2B(10), which outlines major source avoidance limits, and requires that permittees comply with the emissions limitations of their permits.

251. Accordingly, Defendants' conduct constitutes negligence *per se*.

252. The CAA, implemented through the Mississippi SIP, was enacted to safeguard public health and welfare from the adverse effects of air pollution, and specifically aims to protect individuals and their properties from exposure to harmful air pollutants. Plaintiffs, who reside in

proximity to the Amite Facility and whose persons and properties were directly exposed to the Facility's emissions, are precisely the class of individuals intended to be safeguarded under the CAA.

253. The resulting harm to the Plaintiffs is precisely the harm that the CAA seeks to prevent and mitigate through its regulatory framework.

254. Defendants' violations of their permit, Mississippi law and the CAA were the actual and proximate causes of the Plaintiffs' damages and losses including, but not limited to, diminution of the value and marketability of their properties and their property rights; the loss of use of their properties; the loss of use and enjoyment of their properties; and discomfort, inconvenience and annoyance. Accordingly, Defendants are liable for the compensatory and punitive damages to Plaintiffs.

## COUNT V: TRESPASS TO REAL PROPERTY

255. Plaintiffs reallege and reaffirm allegation set forth in paragraphs 1-254 as if fully stated herein.

256. Plaintiffs are in lawful possession of their properties.

257. As a result of the conduct and activities of the Defendants, VOCs, HAPs, wood dust and other PM from the Amite Facility have and continue to physically intrude onto and wrongfully enter Plaintiffs' properties, thereby interfering with the Plaintiffs' possessory interests in their properties without Plaintiffs' permission.

258. The Amite Facility is the source of the above-referenced pollutants in Gloster and surrounding areas.

259. The physical intrusion of the air pollutants emitted by Defendants onto and into the Plaintiffs' properties has physically injured and damaged Plaintiffs' properties by contaminating

the soil, fixtures, structures and other physical aspects of Plaintiffs' properties. This would not have occurred but for the actions of the Defendants.

260. The physical intrusion of the Defendants' harmful air pollutants onto and into the properties owned by the Plaintiffs diminished the value of Plaintiffs' real properties.

261. Defendants conduct their operations with full knowledge that hazardous and dangerous emissions from the Amite Facility have intruded and continue to intrude onto properties owned by the Plaintiffs. Accordingly, Defendants' conduct was willful, wonton, and committed with a reckless disregard for the Plaintiffs' rights and safety, justifying an award of punitive damages.

262. Defendants' trespass was the actual and proximate cause of the Plaintiffs' damages and losses including, but not limited to, diminution of the value and marketability of their properties and their property rights; the loss of use of their properties; the loss of use and enjoyment of their properties; and discomfort, inconvenience and annoyance. Accordingly, Defendants are liable for the compensatory and punitive damages to Plaintiffs.

## COUNT VI: PRIVATE NUISANCE

263. Plaintiffs reallege and reaffirm allegations set forth in paragraphs 1-262 as if fully stated herein.

264. Plaintiffs are in lawful possession of their properties.

265. The unauthorized releases of VOCs, HAPs, wood dust and other PM and noise pollution resulting from Defendants' operation of the Amite Facility have caused and continue to cause a substantial material unreasonable interference with the Plaintiffs' interests in the use and enjoyment of their properties.

266. Plaintiffs' enjoyment of life and property is rendered materially uncomfortable and annoying. Plaintiffs are subjected to the presence of noxious noise, odors, wood dust and other

- 52 -

PM, HAPs and VOCs; the inconvenience of constantly removing accumulations of wood dust and other PM from their properties and belongings; physical discomfort; and increased annoyance and angst associated with the knowledge that they and their families and pets were and continue to be exposed to substances that are toxic to human health.

267. The Defendants' actions were intentional and unreasonable.

268. Alternatively, Defendants' actions were negligent or reckless.

269. Defendants conduct their operations with full knowledge that hazardous and dangerous emissions from the Amite Facility have caused and continue to cause a material interference with the Plaintiffs' enjoyment of their property.  Accordingly, Defendants' conduct was willful, wonton, and committed with a reckless disregard for the Plaintiffs' rights and safety, justifying an award of punitive damages.

270. As a direct and proximate result of Defendants' creation of a nuisance, Plaintiffs as owners and occupants of residential real property have suffered injuries, damages and losses including, but not limited to, diminution of the value and marketability of their properties and their property rights; the loss of use of their properties; the loss of use and enjoyment of their properties; and discomfort, inconvenience and annoyance.  Accordingly, Defendants are liable for the compensatory and punitive damages to Plaintiffs.

## COUNT VII: NUISANCE *PER SE*

271. Plaintiffs reallege and reaffirm the allegations set forth in paragraphs 1-270 as if fully stated herein.

272. On multiple occasions, Defendants' Amite Facility emitted VOCs and HAPs in quantities exceeding the emission limitations set forth in the Amite Facility's Air Construction Permit.

273. By violating the conditions of their Permit, Defendants also violated Mississippi law, including but not limited to 11 Miss. Admin. Code Pt. 2, Ch. 2, R. 2.2B(10), which outlines major source avoidance limits and requires that permittees comply with the emissions limitations of their permits.

274. Moreover, Miss. Code Ann. § 49-17-29(1)(a) (1993) provides in relevant part that "[i]t is unlawful to discharge any wastes, products or substances into the air of the state which exceed standards of performance, hazardous air pollutant standards" and that "any such action is declared to be a nuisance."

275. Accordingly, Defendants' conduct constitutes a nuisance *per se*.

276. The releases of the air pollutants from the Amite Facility have caused and continue to cause a substantial material unreasonable interference with the Plaintiffs' interest in the use and enjoyment of their properties.

277. Plaintiffs' enjoyment of life and property is rendered materially uncomfortable and annoying. Plaintiffs are subjected to the presence of noxious noise, odors, wood dust and other PM; the inconvenience of constantly removing accumulations of wood dust and other PM from their properties and belongings; physical discomfort; and increased annoyance and angst associated with the knowledge that they and their families and pets were and continue to be exposed to substances that are toxic to human health.

278. As a direct and proximate result of Defendants' creation of a nuisance *per se*, Plaintiffs as owners or occupants of residential real property have suffered special injuries, damages and losses including, but not limited to, diminution of the value and marketability of their properties and interference with their property rights; the loss of use of their properties; the loss of use and enjoyment of their properties; and discomfort, inconvenience and annoyance. Accordingly, Defendants are liable for the compensatory and punitive damages to Plaintiffs.

- 54 -

## COUNT VIII: UNJUST ENRICHMENT

279. Plaintiffs reallege and reaffirm allegations set forth in paragraphs 1-278 as if fully stated herein.

280. Defendants failed to incur the reporting and operating expenditures they would have incurred had they accurately classified the Amite Facility as a major source of emissions subject to a Title V Permit. In addition, Defendants failed to incur expenditures they would have incurred had they reduced their production, thereby reducing their emissions, and installed pollution controls to the limit or prevent the release of excess pollutants into the Gloster community and Plaintiffs' properties. Moreover, Defendants failed to incur the expenditure of running their existing emission control equipment at maximum achievable rates to limit or prevent the release of excess pollutants into the Gloster community and Plaintiffs' properties.

281. Defendants have been unjustly enriched by these and other failures to make expenditures to prevent the persons and properties of Plaintiffs from being contaminated with harmful and toxic chemicals.

282. Defendants' failure to incur necessary expenditures was at the cost of the Plaintiffs' properties, property rights and wellbeing.

283. The cost savings to the Defendants, including savings from failing to install and operate pollution control devices and cutting production, is a measurable monetary amount.

284. Defendants have received a measurable monetary benefit by failing to make the necessary expenditures. It would be unconscionable and contrary to equity for Defendants to retain that benefit. The Court, therefore, should award as a remedy an amount equivalent to the expenditures saved and the profits obtained by Defendants at the expense of the Plaintiffs.

## COUNT IX: FRAUD

285. Plaintiffs reallege and reaffirm allegations set forth in paragraphs 1-284 as if fully stated herein.

286. Defendants made material misrepresentations to MDEQ and the public in its 2012 Air Construction Permit application, 2014 Air Construction Permit modification application, August 2016 TVOP application, and its 2017 response to EIP's comments on Draft TVOP, among others, wherein Defendants represented that its Amite facility would emit VOCs and HAPs at levels not exceeding the permitted tpy, and that such emissions posed minimal risk to the surrounding community, including Plaintiffs.

287. These representations made by Defendants were false. In fact, Defendants' Amite facility emits VOCs and HAPs at levels significantly higher than reported.

288. Defendants' false representations were material to MDEQ's decision-making process. The emissions levels and associated health risks were central factors in determining the appropriate permit conditions, monitoring requirements, and emission limits. Had Defendants correctly reported their emissions levels, MDEQ could have issued more stringent emissions limits, monitoring requirements, and equipment and safety controls, among others.

289. Defendants knew or should have known their representations were false or acted with reckless disregard for their truth. At the time of making these representations, Defendants possessed internal data, monitoring reports, peer reviewed data, scientific analyses, and data from Defendants' other facilities demonstrating that actual emissions far exceeded reported levels.

290. Defendants intended that MDEQ rely upon these false representations in making its permitting decisions. Defendants submitted these representations as part of a formal permit application process, knowing that MDEQ would use the information to determine appropriate

permit conditions and that the public, including Plaintiffs, would rely on the integrity of the permitting process for protection from toxic pollution.

291. MDEQ and Plaintiffs were unaware that Defendants' representations were false at the time that they relied upon them. MDEQ and Plaintiffs reasonably relied on Defendants' submitted data and representations as accurate and truthful, as required by law and standard practice.

292. Plaintiffs reasonably relied on the truth of Defendants' representations as implemented through the permitting process. Plaintiffs reasonably relied on Defendants' representations that the operations complied with emission limits and posed only minimal risks to Plaintiffs. Plaintiffs reasonably relied on Defendants' representations that they would not exceed emissions limits set to protect public health. This reliance was reasonable given the regulatory framework designed to protect public health and the legal requirement that permit applications contain truthful information.

293. Plaintiffs had a right to rely on the accuracy of Defendants' representations to MDEQ. As members of the public residing in the area directly impacted by Defendants' emissions, Plaintiffs were within the class of persons the permitting process was designed to protect. Environmental regulations and the permitting process exist specifically to protect public health and maintain and disseminate accurate information about industrial hazards.

294. Plaintiffs suffered and continue to suffer damages as a direct and proximate result of Defendants' fraudulent misrepresentations. The less stringent permit limitations obtained through Defendants' fraudulent misrepresentations allowed Defendants to continue emitting dangerous chemicals at levels that caused material interference with the Plaintiffs' enjoyment of their properties and caused physical discomfort and increased annoyance and angst, among other damages.

295. Accordingly, Defendants' conduct was willful, wonton, and committed with a reckless disregard for the Plaintiffs' rights and safety, justifying an award of punitive damages.

## COUNT X: CIVIL CONSPIRACY

296. Plaintiffs reallege and reaffirm allegations set forth in paragraphs 1-295 as if fully stated herein.

297. Defendants acted in concert with each other to conspire to defraud the Plaintiffs.

298. Defendants together, through their acts and omissions described above, and through the acts of other subsidiaries, joint ventures and affiliates, including consulting firms not named as Defendants, conspired to perform unlawful acts or in the alternative did lawful acts in an unlawful way, and Defendants did perform conduct which caused and contributed to a release of excess toxic pollutants from the Amite Facility and onto and into Plaintiffs' properties, resulting in exposure to Plaintiffs and their properties.

299. At all times relevant hereto, there existed a conspiracy between and among the Defendants regarding the operation of the Amite Facility including, but not limited to, an agreement to underrepresent the Facility's potential to emit VOCs and HAPs, and subsequently, an agreement to underrepresent the quantities of VOCs and HAPs actually emitted from the Amite Facility.

300. Defendants committed acts in furtherance of their conspiracy including, but not limited to, misrepresenting their status as synthetic minor source of VOCs and a minor source of HAPs in the Amite Facility's 2012 Air Construction Permit Application and in later submissions to MDEQ.

301. As a consequence of the Defendants' actions, Plaintiffs suffered losses, injuries, and damages, including, but not limited to, the diminution of the value and marketability of their properties and their property rights; the loss of use of their properties; the loss of use and enjoyment of their properties; and discomfort, inconvenience and annoyance.

302. Accordingly, Defendants are liable for the compensatory and punitive damages to Plaintiffs.

## VII.    JURY DEMAND

303. Plaintiffs, by and through the undersigned, hereby demand a trial by jury on all issues triable under law.

## VIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the following relief:

(a)    Declaration that the Defendants have violated and are continuing to violate the Amite Facility's Air Construction Permit, the Mississippi SIP, and the CAA and its applicable regulations.

(b)    Order that Defendants comply with all emission standards and limitations of the Amite Facility's Air Construction Permit, the Mississippi SIP, and the CAA;

(c)    Order that Defendants take appropriate action to remedy, mitigate or offset the harm to public health and the environment caused by the Defendants' emissions;

(d)    Assess a civil penalty against Defendants as provided by 42 U.S.C. §§ 7413(e) and 7604(a) and (g), and the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461 and 40 C.F.R. § 19.4;

(e)    Award compensatory damages to compensate Plaintiffs for interference with property rights, health and wellbeing, and injury to property caused by the Defendants' conduct;

(f)    Award punitive and exemplary damages;

(g)    Order disgorgement of the profits and savings that were obtained by the unjust enrichment of the Defendants at the expense of the Plaintiffs;

(h)     Order Defendants to pay Plaintiffs' reasonable attorneys' fees and costs (including expert witness fees and costs of suit) as provided by 42 U.S.C. § 7604(d);

(i)     Award pre- and post-judgment interest at the highest rates recoverable under applicable law; and

(j)     for such other and further relief that as may be just and proper.

Dated this _15th_ day of October, 2025.

SINGLETON SCHREIBER, LLP

By: _____

Shani Anderson, Esq.
Attorney for Plaintiffs

OF COUNSEL:

Shani Anderson, Esq., MSB# 105407
Wes Fulgham, Esq., MSB# 99159
Attorneys for Plaintiffs
Singleton Schreiber LLP
750 Woodlands Parkway, Suite 104
Ridgeland, MS 39157
Email: sanderson@singletonschreiber.com
Email: wfulgham@singletonschreiber.com
Telephone: (601) 846-5879